[ * 252 ]    *DAVOUE *against* FANNING, ANN his wife, and others.

A testator bequeathed legacies to each of his seven children, "to be paid out of the bulk of his estate;" and if his executors found that the estate fell short of the amount of legacies, then they were to make an abatement in proportion; and he, afterwards, directed that so much of his real estate as should be necessary to furnish the sums bequeathed, should be sold at public auction, when his children should attain full age, and the remainder be leased by his executors; and that when the youngest child arrived at full age, all his real estate and property, not otherwise disposed of, should be sold, and the proceeds, with the amount of the personal property, be divided among the children, &c. It was held, that the sole acting executor had power to sell the real estate under the will.

If a trustee, or person acting for others, sells the trust estate, and becomes himself interested in the purchase, the *cestui que trusts* are entitled, as of course, to have the purchase set aside, and the property re-exposed to sale, under the direction of the Court. And it makes no difference in the application of the rule, that a sale was at public auction, *bona fide*, and for a fair price, and that the *executor* did not purchase for himself, but a third person, by previous arrangement, became the purchaser, to hold in trust for the separate use and benefit of the wife of the executor, who was one of the *cestui que trusts*, and had an interest in the land under the will of the testator.

*December* 3d.    THE plaintiff is an infant daughter of *Frederick Davoue*, deceased, who, by his last will, bequeathed to her, and her sister *Ann*, (one of the defendants, and wife of the defendant *Fanning*,) 5,000 dollars each, "to be paid out of the bulk of the property," when they should become of age, or marry. The testator directed, that so much of his real estate, as should be necessary to furnish the sums he had therein before bequeathed to his children, should be sold at public auction, when his children should attain to full age, &c., and the remainder of his real estate to be leased or rented, by his executors.

The bill charged, that the defendant *Fanning*, the sole acting executor, pretending that the personal estate was insufficient

to pay the debts and legacies, sold a lot of ground, in *New-York*, though he had no authority by the *will to do so, and that he caused the same to be purchased by *Hedden*, the defendant, for himself, or in trust for his wife, the said *Ann*, which was not lawful, and to the injury of the plaintiff; and that since the sale, *Fanning*, the defendant, had caused buildings to be erected on the lot, and, on the 25th *August*, 1815, mortgaged the property to the defendant *Ashfield*, to secure 3,000 dollars, payable in one year, which sum was borrowed towards paying the expense of the buildings. The bill prayed, that the sale of the lot might be set aside, and the premises resold, &c.

The *answer* stated, that there was not property enough to pay the debts and legacies; and that *Fanning* was the sole acting executor of the testator, and that he caused the lot to be sold at auction, as, he alleged, he had authority to do, under the will. That to secure to the defendant *Ann* her legacy, for her and her children, independent of her husband, she and her husband requested the defendant *Hedden* to attend the sale at auction, and purchase the lot for her, if it should be sold for less than 4,000 dollars; that the defendant *Hedden* attended the sale, and bought the lot for 3,800 dollars, for the said *Ann*; and the answer denied, that the defendant *Fanning* had any other or further concern in the purchase, which the defendants insisted was correct and proper, and in no way injurious to the plaintiff. That the defendant *Fanning*, as sole acting executor, on the 29th of *July*, 1815, executed a deed for the lot to *Hedden*, in trust for the sole and separate use of the defendant *Ann*, and to be at her own disposal. That *Fanning* received no money or other consideration, but only, as executor, credited the 3,800 dollars on account of the legacy due to his wife. That the defendant *Ann* has erected the buildings on the lot, and she and *Hedden*, and the defendant *Fanning*, in her behalf, mortgaged the premises to the defendant *Ashfield*, for *3,000 dollars, payable in one year from the 25th of *August*, 1815, for which they gave their joint bond; that the whole of the money borrowed was applied towards the cost of the buildings, and that about 2,500 dollars still remains due for the expenses of the buildings. The defendants insisted that the mortgage was valid, and ought first to be paid, and the residue of the moneys due ought to be charged on the lot, if the sale should be rescinded; or if the defendant *Fanning* is to be responsible for the sums due, the defendant *Ann* ought to hold the property; but that if the property is resold, so

[ * 254 ]

1816.

DAVOUE
v.
FANNING.

much of the proceeds as belong to her ought to be appropriated for her separate use, &c.

The cause came on to be heard, on the bill and answer.

*Van Wyck*, for the plaintiff.

*T. A. Emmet*, for the defendants.

Power of a sole acting executor to sell the real estate of the testator under the will.

THE CHANCELLOR. 1. The first question arising upon this case is, whether the sole acting executor, who was the defendant *Henry Fanning*, was authorized under the will, without the direction of this Court, to sell any part of the real estate.

If all the executors named had the power by the will, then the sole acting executor has the power by the statute, (*N. R. L.* vol. 1. p. 366.) on the neglect or refusal of the rest of the executors to act.

The will directs that the real estate be sold at public vendue, when it shall become necessary to raise money for the legacies, or when all the children are of age; but it does not say expressly *who shall sell*, though I think, as Lord *Hardwicke* did in a case somewhat similar, (*Black* v. *Willer*, 1 *Atk.* 420.) that it is a very reasonable construction, that the power was given to the executors. It seems almost impossible to mistake the testator's meaning on *this point.

[ * 255 ]

He directed that an inventory of the *real* and personal estate should be taken by the executors; that they were to give the younger children such education as they should think proper; that the legacies of 2,000*l.* to each of the seven children, were to be paid out of " the bulk of the estate," as they should respectively become of age; and that if the executors should find that " the estate" fell short of the legacies, they were to make a deduction and apportionment, according to a rule prescribed. The testator then adds, " I will and direct, that so much of my real estate as shall be necessary to furnish the sums which I have heretofore bequeathed to my children, shall be sold at public vendue, when they shall attain the full age to possess the same, and the remainder of my real estate to be leased or rented by my *executors*; and that when my youngest child shall have attained unto full age, that then all my real estate and property, not otherwise disposed of, be sold, &c., and the proceeds, with the amount of the personal property, be divided among the children," &c.

It is to be observed, that the will directs that the personal property be immediately sold, and the proceeds put at interest, &c., but it is equally silent as to the persons who are to sell it.

202

The object of the power to sell was to raise money for the legacies, which it is, of course, the duty of the executor to discharge; and the will regulates the sale, by declaring it to be at public auction, which it would not have done, if it was intended that the sale should not be made by the constituted agents of the will, but under the directions of this Court. Indeed, taking the whole will together, I think it is a very necessary conclusion, that the executors were the persons intended by the testator to execute the power to sell.

2. The next and principal point in the case is, whether the plaintiff is not entitled to set the sale aside, because the executor, by a previous arrangement, suffered the property *to be purchased in for his wife, and executed a deed in pursuance of the sale in trust for her.

[ * 256 ]

It is contended, on the part of the defendants, that this sale is not open to objection, inasmuch as it was at public auction, and *bonà fide*, and for a fair price, and the purchase was not made for the benefit of the executor himself, but for the benefit of his wife, who was one of the *cestui que trusts*, having an interest in the land. But I am of opinion that these circumstances do not vary the application of the general rule.

The executor, in selling a part of the estate to raise a particular legacy, was acting as a trustee for all those who were interested in the estate under the will, and not exclusively for the benefit of his wife, whose particular legacy he was raising. The plaintiff, and all the other children, had an equal interest with the defendant's wife that the property should be sold to the best advantage, because the greater the price, the greater would be the dividend of the residuary estate. They were all equally *cestui que trusts* of the executor; for he was charged with the duty of applying the proceeds of the estate to their use, and of eventually selling the whole real estate for distribution among them. If, in selling a part of the estate, in the mean time, for a legacy to his wife, he could become the purchaser on her account, or constitute an agent for that purpose, the temptation to abuse of trust would be great and dangerous. Whether a trustee buys in for himself or his wife, the temptation to abuse is nearly the same. Though the money he was raising was to go to the wife, it was no reason why he should be permitted to buy in for her the *estate itself*, when the plaintiff and others had also legacies to be raised out of the estate, and were equally entitled to their share of what should be remaining. His interest here interfered with his duty. *Emptor emit quam minimo potest; venditor vendit quam maximo potest.* Indeed, the very fact that the executor was,

1816.

DAVOUE
v.
FANNING.

Where the trustee himself becomes a purchaser of the trust estate, the *cestui que trust* may, of course, come in and set aside the purchase, and have the property re-exposed to sale. And it makes no difference whether the sale was at public auction, and *bona fide* for a fair price, or otherwise.

[* 258 ]

in that instance, exercising the general *powers of his trust for the benefit of his wife, was peculiarly calculated to touch and awaken the suggestions of self-interest. The case, therefore, falls clearly within the spirit of the principle, that if a trustee, acting for others, sells an estate, and becomes himself interested in the purchase, the *cestui que trust* is entitled to come here, as of course, and set aside that purchase, and have the property re-exposed for sale.

I consider this to be a sound and settled doctrine of the Court. But as the point is extremely important, and has been long and greatly agitated, it will be safer, and certainly more satisfactory to the parties, that I should not only lay down the rule, but look into the authorities on which it is supported.

The earliest case I have met with, containing any full recognition of the principle, that a trustee cannot act for his own benefit on a subject connected with the trust, is that of *Holt* v. *Holt,* in the 22 *Car.* II., (1 *Ch. Cas.* 190.) where it was held, by the Lord Keeper *Bridgman,* assisted by the judges, that if an executor in trust renewed a lease, it should be for the benefit of the *cestui que trust.* The next case that occurs was that of *Keech* v. *Sandford,* before Lord Ch. *King,* in 1726. (3 *Eq. Cas. Abr.* 741.) A lease of the profits of a market was devised to a trustee, in trust for an infant; before the expiration of the term, the trustee applied to the lessor for a renewal for the infant's benefit, which he refused, because he could not distrain, but must rest singly on covenant, which the infant could not make. The trustee then took a lease to himself, and the chancellor decreed, that the lease should be assigned to the infant, and that the trustee should be indemnified from the covenants in the lease, and the trustee account for the profits since the renewal. He said he must consider it a trust for the infant, "for if the trustee, on refusal to renew, might have a lease to himself, few trust estates would be renewed to *cestui que trusts;* and though it might seem hard that the trustee was the only person of all mankind who might not have the lease, yet it was very proper that the rule should be strictly pursued, and not in the least relaxed, for it was very obvious what would be the consequence of letting trustees have the lease on refusal to renew to *cestui que trusts.*"

If we go through all the cases, I doubt whether we shall find the rule and the policy of it laid down with more clearness, strictness, and good sense. This decision has never been questioned; and that a trust results on the renewal of an infant's lease, has since been regarded as a familiar point. (1 *Bos. & Pull.* 376.)

The general principle was first brought before Lord *Hardwicke*, in *Davison* v. *Gardner*, in 1743, and the rule was admitted with rather more relaxation than is tolerated at this day, if we can rely upon the account of this MS. case, as it is variously stated in some of the elementary compilers. (1 *Cruise's Dig.* 551. *Sugden's Law of Vendors*, 436.) The case was a purchase of a *feme covert* of her interest in a brew-house. She acted at the time as a *feme sole* in respect to her separate estate, and the defendant, who purchased of her, was her trustee. The chancellor would not set aside the sale, because she received the full value, and the purchase was fair. I do not know that this case differs, in this respect, from the later decisions, for they all allow a trustee to purchase from the *cestui que trust*, under very special and guarded circumstances, amounting to a fair and distinct dissolution of the trust connection between them, at the time of the purchase. Lord *Hardwicke* observed, that the Court always looks with a jealous eye at a trustee purchasing of his *cestui que trust*; and he would not permit any purchase, by a trustee, during the minority of the *cestui que trust*; but he said, that where there was a decree for the sale of the trust estate, and an open auction by the master, or a *public sale, by proclamation, in the country, there the Court had permitted a trustee to purchase, by refusing to set aside the sale, when all other circumstances were fair. I apprehend these latter *dicta* are clearly overruled, and that whether the *cestui que trust* be an infant or an adult, and whether the sale be public or private, the trustee is equally disabled from becoming a pu₋ chaser of the trust estate. The next case before Lord *Hardwicke* was that of *Whelpdale* v. *Cockson*, in 1747. (1 *Vesey*, 9. 5 *Vesey*, 682. S. C.) That was a bill by a creditor against the defendants, as executors and trustees. The answer admitted a purchase at auction of part of the estate, and the chancellor would not suffer it to stand, as he said he knew the dangerous consequence, and that it was not enough for the trustee to say *you cannot prove any fraud*, for it is in his own power to conceal it. He, therefore, ordered the creditors to elect, whether they would abide by the purchase; and declared, that if a majority elected not to abide by it, he would order a resale by the master.

This case corrects the inaccurate *dictum* in the preceding one, that a sale at auction took away the objection, and it lays down the rule, and the remedy, in clear and precise terms. The only thing to be objected to in the report of the case is, that the remedy should be made to depend upon the will of a *majority* of the *cestui que trusts*; for this is not only questioned in the later cases, but seems contrary to the

[ * 259 ]

1816.

DAVOUE
v.
FANNING.

[ * 260 ]

[ * 261 ]

settled rights of parties, for one *cestui que trust* has no power to control or give away the right of another.

· The case of *Fox* v. *Mackreth*, which arose before Lord *Thurlow*, in 1788, (2 *Bro.* 400. 6 *Vesey*, 627. 9 *Vesey*, 247.) and underwent long and great discussion, is important only to show the solidity and value of the principle, that a trustee cannot be permitted to purchase, even of his adult *cestui que trust*, unless he has first fairly discharged himself from his office of trustee, and placed himself *in circumstances to make a fair contract. This is the same doctrine which had been intimated by Lord *Hardwicke*, in *Ayliffe* v. *Murray*. (2 *Atk.* 59.) But in *Whichcote* v. *Lawrence*, (3 *Vesey*, 740.) Lord *Rosslyn* seems to have spoken with a carelessness and latitude of expression, which has given occasion to much criticism in the subsequent cases. An estate was conveyed to trustees, to sell for the benefit of creditors; the estate was put up at auction, and the defendant (one of the trustees) purchased two lots, for which he received deeds from the other trustees, and he afterwards resold his lots at a profit. The bill was by three only of the numerous creditors, praying that this trustee might account for the profit he had so made, and it was so decreed, with costs. It is to be observed, that relief was here granted to a minority of the creditors, and it is not the decree, but the observations of the chancellor, that are deemed inaccurate. He said the trustee had here made a profit, and he did not recollect a case, in which the mere abstract rule came distinctly to be tried, abstracted from the consideration of advantage made by the purchaser. That the proposition was not true, that where the trustee to sell was the purchaser, the sale was, *ipso jure*, null. That the real sense of the proposition was, that the trustee to sell should not gain any *advantage* by being himself the person to buy. That he is not to be permitted to gain profit by the execution of the trust; that unless the advantage be made, the purchase will never be questioned, and that it was not true as a naked proposition, that a trustee cannot buy of his *cestui que trust*.

The objection to most of these observations is, that they do not place the question on the true principle. However innocent the purchase may be in the given case, it is *poisonous in its consequences*. The *cestui que trust* is not bound to prove, nor is the Court bound to judge, that the trustee has made a bargain advantageous to himself. The fact *may be so, and yet the party not have it in his power, distinctly and clearly, to show it. There may be fraud, as Lord *Hardwicke* observed, and the party not able to prove it. It is to guard against this uncertainty and *hazard* of

abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust* to come, at his own option, and without showing actual injury, and insist upon having the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil. It is one which appears to me, from the cases which have been already cited, and from those which are to follow, to be most conclusively established.

In *Campbell* v. *Walker*, (5 *Vesey*, 678. 13 *Vesey*, 600.) Lord *Alvanley*, then master of the rolls, declared, that the rule necessarily existed to this extent. That was a devise of real estate to the trustees to sell. They sold at auction, and bought in a part for themselves, at a fair price. There was no proof that the purchase was at an undervalue, or that the sale was not *bona fide* and regular. The bill was in behalf of residuary legatees, then infants, to have the sale set aside, and the lands resold. It was accordingly so decreed; and the master of the rolls said, that the rule did go to the extent, that the *cestui que trust* had a right to set aside the purchase, and have the estate resold, if he chose to say, in any reasonable time, that he was not satisfied with it. The trustee purchases subject to that equity. He buys with that clog. The only way for a trustee to purchase safely, if he is willing to give as much as any one else, is by filing a bill, and saying, so much is bid, and I will bid more, and the Court will then examine into the case, and judge whether it be advisable to let the trustee bid. In that way the Court will devest him of his character of trustee, and prevent all the consequences of his acting both for himself and for the *cestui que trust*. In no other way, as he observed, could the trustee become the purchaser, without being liable to be *called upon to give up his purchase. It is impossible to know whether any advantage has been gained by the purchase, or whether the trustee did all he ought to have done. In that very case, he still retained the land, the defendants were still trustees, and if the plaintiffs elected to have the premises resold, they must be resold.

[ * 262 ]

When this cause was, afterwards, brought before Lord *Eldon*, on the master's report of the sale, the infants recovered their costs; and he observed, that a trustee for sale could not contract with the *cestui que trust*, until he had distinctly and honestly removed himself from the relation of trustee, which could not have been done, in that case, as the *cestui que trusts* were infants. He said that a sale by auction made no solid difference, as the auctioneer was an agent employed by the vendor.

It appears to me, that the observations of Lord *Alvanley*, in the above case, illustrate the true rule and the reason of

1816.

DAVOUE
v.
FANNING.

t, in a forcible and perspicuous manner; yet it would seem that he acted in direct contradiction to his own opinion, for he first directed an inquiry, by a master, whether a resale would be for the benefit of the infants. This was shaking the principle itself. There was hazard in the inquiry, and it was far from checking such sales. Lord *Eldon* expressed his disapprobation of the inquiry; and it was certainly an instance of surprising inconsistency between the reasoning and the conclusion.

Lord *Rosslyn*, in the case *ex parte Reynolds*, (5 *Vesey*, 707.) seemed to adopt the true rule, that a trustee cannot purchase without being exposed to a resale. In that case, the assignee of a bankrupt purchased at auction the estate of the bankrupt, under the commission, and the chancellor ordered the estate to be set up again, and that if it did not sell for more than he gave, the purchase was to stand.

[ * 263 ]

I proceed next to the decisions by Lord *Eldon*, which are uniform in support and vindication of the rule. They *leave no possible doubt on the subject. Thus, in the case *ex parte Lacey*, (6 *Vesey*, 625.) the assignee of a bankrupt was purchaser of part of his estate, and the chancellor declared, that when a trustee undertakes to manage for others, he undertakes not to manage for his own benefit; that he cannot buy until, by a new contract with his *cestui que trust*, he has stripped himself of his character of trustee; but even this new contract is watched with infinite and the most guarded jealousy, because he may have acquired information, as trustee, which the Court cannot be certain he has communicated to the *cestui que trust*. He disavows the interpretation of Lord *Rosslyn*, that the trustee must make advantage. Whether he makes advantage or not, if the connection does not satisfactorily appear to be dissolved, it is in *the choice* of the *cestui que trust*, whether or not he will take back the property. The ground of the rule is, that though you may see, in a particular case, that he has not made advantage, it is impossible to examine sufficiently, in ninety-nine cases out of a hundred, whether he has made advantage or not.

In this case, another sale was ordered, and the premises were directed to be put up at the price the assignee gave, and if no more was bid, the purchase was to stand.

In another case, (*ex parte Hughes*, 6 *Vesey*, 617.) Lord *Eldon* thought, that a creditor of the bankrupt, *or any agent of the sale*, was within the reason of the rule, and could not be permitted to bid; and in this case he ordered the property to be set up for resale, at the price the creditor gave, together with the amount of his *bona fide* and substantial improvements, which were to be allowed him, and that if the

property sold for more, he should be paid for his improvements out of the purchase money, and if not, that he should be held to his purchase. This rule of setting aside the purchase by the trustee, at the option of the *cestui que trust,* and of directing a resale, upon the condition that the property produces a better *price, was afterwards adopted by Sir *Wm. Grant,* in *Lester* v. *Lester,* (6 *Vesey,* 631.) and he said the rule was so established in Lord *Thurlow's* time.

The case *ex parte James,* (8 *Vesey,* 337.) contains a still further illustration and confirmation of the rule. It was there applied to a purchase, at auction, by a solicitor to the bankrupt commission, who was considered, as well as the assignees, to come within the mischief to be prevented; and he explicitly declared, that he did not proceed upon the ground of undervalue or want of fairness in the purchase, but upon the general principle. This case is deserving of notice, in another respect, for it may be considered as overruling the *dictum* or decision of Lord *Hardwicke,* that a *majority* of the *cestui que trusts* was sufficient to ratify the purchase of the trustee; for Lord *Eldon* declared, that the solicitor was not entitled to hold the land against the consent of *any* of these persons entitled to the surplus of the estate. He had said, also, in another place, (6 *Vesey,* 625.) that he held that opinion of Lord *Hardwicke* to be erroneous.

In the case *ex parte Bennett,* (10 *Vesey,* 385.) Lord *Eldon* went again, and at large, into the policy, the necessity, and the authority of the principle which we are considering. I need not repeat the argument, though I think that, in that case, he dwelt upon the subject with uncommon interest and vigor of decision. He applied the rule once more to the solicitor to a commission of bankruptcy, and to the commissioner purchasing for himself *or for another.* To permit either to bid, would be applying the information acquired by their trust to their own benefit. He said it was settled, that it was not requisite to show that the trustee had made any advantage by the purchase. If a trustee can buy in an honest case, he may in a case having that appearance, but which, from the infirmity of human testimony, may be grossly otherwise; and yet the power of the Court would not be equal to detect the deception. *Human infirmity will rarely permit a man to exert against himself that providence which a vendor ought to exert, in order to sell the estate most advantageously for the *cestui que trusts,* and which a purchaser is at liberty to exert for himself, in order to purchase at the lowest price. If the trustee cannot bid for himself, he cannot, on the same principle, bid for another. The distinction of its being a weaker temptation, is too thin to form a safe rule of justice.

1816.

DAVOUE
v.
FANNING.

[ * 264 ]

[ * 265 ]

1816.

DAVOUE
v.
FANNING.

The decree there was, also, that the expense of the lasting repairs and substantial improvements, made subsequent to the purchase, should be added to the purchase money, and the estate put up again at the accumulated sum.

In *Randall* v. *Erington*, (10 *Vesey*, 423.) the sale was fair, and the purchase by the trustee, at auction, for a full price; but he had subsequently sold a part, at some profit, and the Court opened the sale at the request of the *cestui que trust*, as to the parts not sold, and held the trustee to account for the profit on the part he had sold.

It remains only to observe, that during the time that Lord *Erskine* presided in the Court of Chancery, he gave the most unequivocal sanction to these doctrines, and declared that they were founded on the clearest principles of equity, and the general security of contracts.   (*Morse* v. *Royal*, 13 *Vesey*, 355.  *Lowther* v. *Lowther*, 12 *Vesey*, 95.)   He went so far as to say, that there was so much difficulty in supporting a purchase by a trustee, even from his *cestui que trust*, and it required to be guarded with so much jealousy, that it would have been better to have interdicted it altogether.   Indeed, no person could have expressed himself in stronger language, as to the delicacy and danger of *such* purchases, than Lord *Eldon* himself did on repeated occasions.  (*Coles* v. *Trecothick*, 9 *Vesey*, 234.  *Ex parte Bennett*, 10 *Vesey*, 385.)

[ *266 ]

It is proper to observe here, that this whole chancery doctrine has received the entire approbation and sanction *of the Supreme Court of *Pennsylvania*.  (3 *Binney*, 54. 4 *Binney*, 43.)   Those decisions come with the more force, and are the more applicable as authority, when we consider that the Court is obliged, from the necessity of the case, (as they have no chancery tribunal,) to study, adopt, and apply, equity principles more freely, and more liberally, than is usual in Courts of law.

The same doctrine has, also, been recognized in our own Courts.  The Supreme Court, in *Jackson* v. *Van Dalfsen*, (5 *Johns. Rep.* 43.) admit it to be a well-settled rule in equity, that a trustee, or agent to sell, shall not, himself, become the purchaser; and they very properly refer the remedy of the *cestui que trust* in such cases to the cognizance of chancery.  The doctrine underwent much discussion in this Court, and finally in the Court of Appeals, in *Munro and others* v. *Allaire*. (2 *Caines's Cases in Error*, 183.)  *Allaire* was one of the executors of *Benjamin Palmer*, deceased, with power to sell the real estate, and he purchased of *Mary Palmer*, the widow and devisee, and, also, one of the executors, her right in the whole estate.  She, subsequently to this purchase, conveyed her right to *Munro* and *Sniffin*, and a bill was filed by *Allaire* for a specific performance of

his agreement with *Mary Palmer*, and for a more perfect assurance and conveyance of her right. The purchase was charged to have been fairly made, after long consultation, in which she was assisted by a friend; and that *Allaire* gave a full price, and more than had been previously offered by another. To this bill *Mary Palmer* filed a demurrer, which was overruled in this Court, and she was ordered to answer. From this decretal order an appeal was brought, and the decree, overruling the demurrer, was reversed in the Court of Appeals, in 1796.

This decree of the Court, in the last resort, assumed the doctrine of the general disability of the trustee to purchase from the *cestui que trust*. It was not intended to be understood, I presume, of an absolute, unqualified disability, *such as Lord *Erskine* was willing to adopt; for there were circumstances relied upon, in this case, to show that neither *Mary Palmer*, or her friends, were acquainted with the nature or extent of the rights she undertook to convey. The case may, therefore, be considered as establishing only the general doctrine in *Fox* v. *Mackreth*, and in the other cases which I have noticed. But I allude to the case as containing a full recognition of the general rule, that a trustee to sell cannot, himself, purchase. The only opinion given in the Court of Errors, (at least, the only one published,) is that of Mr. Justice *Benson*, in which the rule is laid down in these broad and general terms: " It is a principle," he says, " that a trustee can never be a purchaser ; and I assume it as not requiring proof, that this principle must be admitted, not only as established by adjudication, but also as founded in indispensable necessity, to prevent that great inlet of fraud, and those dangerous consequences which would ensue, if trustees might themselves become purchasers, or if they were not, in every respect, kept within compass. Although it may, however, seem hard that the trustee should be the only person of all mankind who may not purchase, yet, for very obvious consequences, it is proper the rule should be strictly pursued, and not in the least relaxed."

We cannot but notice the precision and accuracy with which the rule, and the reason of it, are here stated ; but the rule appears to be much weakened in the subsequent part of the opinion.

He makes a distinction to show that the rule, thus laid down, is not to be understood in an absolute, unqualified sense. A trustee, it is said, is never to be assisted in this Court, by giving effect to such a purchase; but it does not follow that chancery is bound, in every case, and of course, to annul such a purchase, on the application of the *cestui que trust*. His words are, " That it is not, in every instance, in-

*1816.*

DAVOUE
v.
FANNING.

[ * 267 ]

1816.

DAVOUE
v.
FANNING.

dispensable that all the *cestui que trusts* should *agree to waive the implied fraud; it may be sufficient for a majority, or such other number, or proportion of them, to agree, as that, according to the circumstances of the case, it may be presumed there was no fraud in fact."

It appears to me, with great submission, that the learned judge has, in these observations, wounded the true principle which he had before so clearly declared. I presume he was misled by the case of *Welpdale* v. *Cookson*, in which Lord *Hardwicke* held that a majority of the *cestui que trusts* were sufficient to establish the purchase, whether the minority were consenting or not, and which case has been repeatedly questioned, and, in practice, overruled. But this is not all. He seems to think the Court are only to be satisfied that there was no *fraud in fact*, whereas it has been, again and again, decided, and the principle pervades the whole body of the cases, that the inquiry is not whether there was, or was not, fraud in fact. The purchase is to be set aside, at the instance of the *cestui que trust*, and a resale ordered, without weighing the presumption of fraud, on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the Court.

In addition to these cases in our own Courts, I may refer to the statute which prohibits a sheriff, or other officer to whom an execution is directed, from purchasing at the sale under it. This is in affirmance of the same general rule; and the other statute, which allows a mortgagee, selling under a power, to purchase in the land, provided the sale be, in every other respect, regular and fair, does, by that very exception, recognize the existence of the rule in all other cases.

There is one case more on this subject too important to be omitted; that of *The York Buildings Company* v. *Mackenzie*, which was decided in the *English* house of lords in 1795, on appeal from the Court of Sessions in *Scotland*. (8 *Bro. P. C.* by *Tomlins*. App.)

[ * 269 ]

† For the appellants, J. Mansfield, J. Mackintosh, R. Dundas; for respondent, J. Scot, Wm. Grant, W. Adam.

*That case is a complete vindication of the doctrine I am now to apply; and, considering the eminent character of the counsel† who were concerned, and who have since filled the highest judicial stations, and the ability and learning which they displayed in the discussion, it is, perhaps, one of the most interesting cases, on a mere technical rule of law, that is to be met with in the annals of our jurisprudence.

The appellants were an insolvent company, and their estates were sold by order of the Court of Sessions, at a public judicial sale, to satisfy creditors. The course at such sales is to set up the property at a value fixed upon by the Court, which is called the *upset price*, and which is founded

212

on information procured by the *common agent* of the Court, who has the management of all the out-door business of a cause. The respondent here was the common agent in that cause, and he purchased for himself, at the upset price, no person appearing to bid more, and the sale was confirmed by the Court; and in the course of eleven years' possession, he had expended large sums for building and improvements. There was no question as to the fairness and integrity of the purchase. But the object of the appellant was to set aside the sale, and have the estates sold anew, on the ground that the respondent, being the common agent in Court, in behalf of all parties, to procure information and attend the sale, was in the nature of a trustee, and so disabled to purchase.

The reasons of the house of lords for setting aside the sale are not given, and we are not left to infer them from the argument upon which the appeal was founded.

The appellants contended, that the common agent was under a disability to purchase, arising from his office; that the rule was founded in reason and nature, and prevailed wherever any well-regulated administration of justice was known; that the disability rested on the principle which dictated that a person cannot be both judge and party, *and serve two masters; that he who is intrusted with the interest of others, cannot be allowed to make the business an object to himself, because, from the frailty of nature, one who has power will be too readily seized with the inclination to serve his own interest at the expense of those for whom he is intrusted; that the danger of temptation does, out of the mere necessity of the case, work a disqualification; nothing less than incapacity being able to shut the door against temptation, where the danger is imminent, and the security against discovery great; that the wise policy of the law had, therefore, put the sting of disability into the temptation, as a defensive weapon against the strength of the danger which lies in the situation; that the parts which the buyer and seller have to act, stand in direct opposition to each other in point of interest; and this conflict of interest is the rock, for shunning which the disability has obtained its force, by making that person, who has the one part intrusted to him, incapable of acting on the other side.

Several cases were referred to in the civil law, showing clearly, that the same principle had a deep and firm foundation in that system, and was most extensively applied, as for instance, to guardians, tutors, curators, procurators, judicial officers, and all other persons who, in any respect, as agents, had a concern in the disposition and sale of the property of others, whether the sale was public or private, judicial or otherwise. The passages to this purpose are to

[ * 270 ]

1816.

DAVOUE
v.
FANNING.

[ * 271 ]

[ * 272 ]

be found in the *Digest,* lib. 18. tit. 1. ch. 34. s. 7. and lib. 18. tit. 1. ch. 46. and in lib. 26. tit. 8. ch. 5. sec. 2.

The counsel for the respondent admitted the general principle, and contented themselves with denying its application, holding that the common agent was not to be considered, in that case, and in respect of that sale, in the character of seller or trustee.

But the house of lords thought otherwise, and set aside the sale, ordering the purchaser to account for the *rents and occupation in the mean time, with a liberal allowance to him for his permanent improvements. This decision certainly carried the doctrine to its full extent, and it may be considered as a high and authoritative sanction given to the reasoning which accompanied the appeal.

I shall, accordingly, set aside this sale, upon the usual terms.

The following decree was entered:

" This cause being admitted by the counsel for the respective parties, upon the bill and answer, and the same being duly considered, and it appearing to the Court, that though the said *Henry Fanning,* as sole acting executor, &c., had authority, under the will, to sell the lot of land in the pleadings mentioned, to raise the legacy due to his wife; yet inasmuch as he caused the said lot, on such sale, to be purchased in for the benefit of his wife exclusively, it is ordered, &c., that the said sale to the defendant *Hedden,* in trust for the wife of the defendant *Fanning,* be set aside, and vacated, upon the following conditions, viz.: that the said lot be re-exposed to sale, at public auction, by the defendant *Henry Fanning,* with the concurrence and agency of one of the masters of this Court, on giving four weeks' notice of the time and place of sale, in two of the daily papers printed in the city of *New-York.* That the said lot be put up at the sum of 9,600 dollars, being the amount of the former sale, together with the principal and interest of the mortgage since charged thereon, and of the debts incurred for substantial improvements, and if the said lot, with the improvements thereon, shall not sell for more than the said sum of 9,600 dollars, the sale heretofore made shall, in all respects, stand confirmed; but if the said lot shall sell beyond that sum, then the former sale shall be held to be vacated, and the defendant *Henry Fanning,* as acting executor aforesaid, together with the said master, shall execute a deed in fee to the purchaser, *on receiving the consideration money, which moneys shall be received by the said master, and forthwith thereafter brought into Court, to be subject to its further disposition; and the question of costs, and all further questions, are, in the mean time, reserved."