### W. A. Nabours et al. v. A. P. McCord et al.

No. 1270. Decided May 9, 1904.

**1.—Trust—Assignee Taking Title Through Sale by Himself—Charge.**

In a suit by accepting creditors to set aside a sale of property of an insolvent by his assignee who had acquired title thereunder it was error to charge that such sale was valid if the purchaser had not bound himself to let the assignee take the property at the amount of his bid, but had merely purchased under a guaranty, made in good faith by such trustee and for the purpose of having the whole property bring a fair price, to take a part of same off his hands. (Pp. 532-536.)

**2.—Same.**

A sale of property by assignees for the benefit of creditors made directly or indirectly to one of such assignees, without the consent of the beneficiaries in the trust, was voidable at the election of such beneficiaries, within a reasonable time, without regard to whether the purchase by such assignee was made in good faith and for an adequate consideration or not. (P. 533.)

**3.—Same—Cases Distinguished.**

The case of a trustee purchasing indirectly at his own sale distinguished from those of public sales by order of court and subject to its confirmation (Ives v. Ashley, 97 Mass., 198; Stalling v. Foreman, 2 Hill Ch., S. C., 405) and of purchases by a trustee from the beneficiary (Erskine v. De la Baum, 3 Texas, 406; Hickman v. Stewart, 69 Texas, 255), or by a beneficiary from the trustee (Howard v. Davis, 6 Texas, 174). (Pp. 533, 534.)

**4.—Same—Trustee's Guaranty of Resale ·by Purchaser.**

Where the trustee guaranteed resale by the one intending purchase of a part of the property at the price of sale, which was on credit, and afterwards furnished the money to carry out this arrangement in the name of a third party to whom, on making payment, the property, held by the trustee till that time, was transferred by the purchaser, the sale was, indirectly, one by the trustee to himself, and was voidable by the beneficiaries irrespective of the good faith of the transaction. (Pp. 535, 536.)

Certificate of dissent from the Court of Civil Appeals for the Third District, on error from Milam County.

*D. W. Doom, W. K. Homan, Hefley, McBride & Watson,* and *Etheridge & Baker,* for plaintiffs in error.—Where the trustee's sale to a stranger is colorable only, and is made in whole or in part for the use of the trustee, or upon any understanding express or implied between the trustee and the purchaser for any future interest of the trustee in the purchase or in the trust property purchased, a court of equity will deal with the trustee as a direct purchaser from himself and will avoid his purchase at the suit of his cestui que trust. Where the trustee, having ostensibly conveyed to a stranger, suddenly becomes interested with his own grantee, a court of equity will regard the transaction with great jealousy, and will avoid it in favor of the cestui que trust upon evidence of the collusion in the trustee's sale between the trustee and the purchaser. When the trustee's purchase from his grantee follows closely on an executory sale of the trust estate, almost contemporaneously, as in this case, such a rule might well operate to permit collusive sales of trustees to third persons for their own benefit; and the court is inclined to presume that the sale of the trustee was made to himself. Dunlap v. Beckes, 23 Kan., 154; Davoue v. Fanning, 2 Johns. Ch., 252; In re Taylor Orphan Asylum, 36 Wis., 552; Price v. Thompson, 84 Ky., 227, 228; Staats v. Bergen, 17 N. J. Eq., 558; Bassett v. Shoemaker, 20 Atl. Rep., 52; Cook v. Berlin Woolen Mill Co., 43 Wis., 440-441; Harrison v. McHenry, 9 Ga., 164; Michoud v. Girod, 4 How. (U. S.), 188; Abbot v. American Hard Rubber Co., 33 Barb., 593; 2 Pom. Eq. Jur., secs. 957-958.

As to the property still in the possession of McCord, plaintiffs are entitled to recover the same, and as to the property converted by him, the measure of plaintiff's damages is the highest price thereof at any time before the trial. Mixon v. Miles, 46 S. W. Rep., 107; Mixon v. Miles, 92 Texas, 318; Booth v. Fiest, 80 Texas, 141.

*Ford & Chambers, J. M. Ralston, T. S. Henderson, M. J. Moore, Crane, Greer & Wharton,* and *N. H. Tracy,* for defendants in error.—If Lawrence purchased the property in question in good faith, unincumbered by conditions, agreements or understanding with Captain McCord, he became the absolute owner, and could afterwards convey a valid title to Captain A. P. McCord or any other person. The secret intention of Captain McCord to afterwards acquire the property from Lawrence could not vitiate the sale to Lawrence unless it was known to and participated in by him. Bergin v. Producers' Marble Yard, 72 Texas, 53; Ellis v. Valentine, 65 Texas, 549; Schneider v. Sansom, 62 Texas, 201; Greenlce v. Blum, 59 Texas, 126; Iglehart v. Willis, 58 Texas, 306; Vanhook v. Walton, 28 Texas, 79; Baldwin v. Peet, 22 Texas, 717; Ives v. Ashley, 97 Mass., 204; 11 Am. and Eng. Enc. of Law, 1022.

BROWN, ASSOCIATE JUSTICE.—Certified question from the Court of Civil Appeals of the Third Supreme Judicial District, as follows:

"The plaintiffs in error, Nabours and others, brought this suit for their own use, and for the use of all other accepting creditors of W. F. and F. M. Crawford under a deed of assignment made to defendants, McCord and Henderson, as assignees, naming as defendants the assignees and their bondsmen and the Milam County Oil Mill Company. At the trial the plaintiffs dismissed their suit as against the defendants Henderson and the bondsmen, and upon the verdict of a jury for the remaining defendants, judgment was accordingly entered, from which the plaintiffs have sued out this writ of error. The suit as against McCord is predicated upon the charge of breach of duty on his part in negotiating and making a pretended sale of part of the assigned estate to a third party under circumstances contemplating a retransfer to him, followed by such transfer and subsequent appropriation of the property to his own use.

"The property which it is alleged that McCord thus acquired consisted of stock in the defendant oil mill of the par value of $24,200, an undivided interest of 1300 acres of land in Jefferson County, a like interest of 1000 acres in Milam County, and a one-half interest in five notes of the face value of $5743.75, secured by a vendor's lien on 510 acres of land in Milam County.

"The oil mill was made defendant for the purpose of protecting the rights of creditors in the above stock pending this suit as to the payment of dividends and otherwise.

"The plaintiffs in error seek a reversal of the judgment upon three grounds, viz: (1) Error in the court's charge as given; (2) error in refusing a special charge asked, and (3) error in refusing to set aside the verdict on motion for a new trial, because contrary to the evidence. It is sufficient for the purposes of this opinion to find the facts of the case, as shown by the record, to be:

"(1) W. F. Crawford and F. M. Crawford, bankers at Cameron, Texas, under the firm name of Milam County Bank, failed in business

March 16, 1896, owing debts secured to the amount of $45,190.97, and unsecured in the sum of $79,619.40. On that day they executed a statutory deed of assignment, naming McCord and Henderson as assignees, who qualified on the following day and proceeded with the administration of the trust until they filed their final report on June 23, 1900.

"(2) This report shows that the remnant of the estate, consisting of the property sued for and other lands and chattels, was sold to C. W. Lawrence on May 5, 1897, for the sum of $22,500. That the total receipts were $90,271.21, a large part of which was used in redeeming such of the assets held in pledge as were thought to be to the interest of the estate, and the balance, after paying expenses, was sufficient to pay five dividends, aggregating 40.82 per cent to the unsecured creditors, who had filed claims amounting to $76,624.22, leaving unpaid practically 59 per cent of these claims, or more than $45,000.

"(3) The plaintiffs were among those who accepted under the deed of assignment, filed their claims duly verified, as required by law, and have rights entitling them to prosecute this suit.

"(4) The facts connected with the sale to Lawrence, as disclosed by the testimony of himself and Ralston and other witnesses for the defendants, are as follows: Lawrence and one Sprinkle had for some time been considering the joint purchase of the remnant of the assets, after the assignees had indicated a desire to close the administration by sale in bulk, if necessary, and had made a list of what remained and attached a value or selling price to certain articles, among which was the property in controversy. Ralston and his law partner were employed by these parties under an agreement that Lawrence and Sprinkle should furnish the money to make the purchase, and the lawyers were to assist in making collections and sales, and the net profits, after repaying the money advanced and interest, were to be equally divided.

"Mr. Henderson, as one of the assignees, appears to have been anxious to close out the assets and received a bid of about $20,500 for the remnant from one Hefley. Notice of this reached Lawrence and Ralston, and they began to consider what amount they would offer. There is no evidence that the bid made by Hefley was his final offer, and it is shown that as soon as he heard of the deal with Lawrence for $22,500 he offered him $2000 for his bargain. Lawrence did not want to buy the oil mill stock and the other property sued for, to which values were affixed in the list, and objected particularly to the stock. Ralston, who lived with McCord and was related to him, told him of Lawrence's objections, to which McCord replied, as shown by Ralston's testimony, 'The oil mill stock is worth that much money ($8000) and ought to sell for that much money, and if he makes a proper bid and gets the oil mill stock and wants to sell it for that amount, I can get him a purchaser for it at that.'

"Ralston states that in talking with Lawrence the next day he stated

97 Supreme—34.

to him 'that we need not be afraid of not being able to turn the oil mill stock if we wanted to at that price; that if we bought it, that a party told me that he would have a purchaser for it at that price if he (we) wanted to sell it.' Ralston did not tell Lawrence who made the statement, and the only inquiry made by Lawrence was if the party was responsible and could be relied on. He then raised objections to the other properties sued for. This was also reported to McCord by Ralston. The same assurances being given and reported back to Lawrence, he concluded that he would be safe in making an offer of $22,500 for the remaining assets, provided he could get terms. The record does not show what terms were asked, but the contract as closed resulted in the assignees giving him until June 1st to pay $8500 and until October 15th to pay the remaining $14,000, they to retain possession of everything, and to surrender the different items to him as he was able to realize upon them and pay their list value.

"A written proposition was then drawn to the above effect and carried by Lawrence to Henderson, who objected to signing an acceptance of it until he could consult with McCord. Being assured by Lawrence that if it was not satisfactory to McCord the trade would not be closed, Henderson signed the paper and it was subsequently signed by McCord, but the date of his doing so is not shown. While Lawrence, in giving his views as to the effect of what occurred in connection with the contract, states that he did not know who the party was that gave the assurance or guaranty of a purchaser to Ralston, and that there was no contract or agreement, expressed or implied, that he was buying for McCord, or was to retransfer any part of the property to him, he nevertheless says, 'but for the guaranty he would not have bought' the stock and other property sued for, that he made the inquiry as to the responsibility of the party because he 'felt or expected that he would sell that stuff to that man' and wanted to know if he was able to carry out his contract; that he did not want to handle this part of the property, because he did not think there was anything in it; that after the contract was closed he paid but little attention to these items of property, because he expected in pursuance of that guaranty for them to be taken off his hands.

"This witness further states that 'after the trade was closed I saw Mr. Ralston about his land and I insisted on it being closed up; these were matters that I thought were important, and should be closed up.'

"Lawrence testifies that, when he made the proposition to buy, Sprinkle was interested with him, that he went to Sprinkle, told him that there was not enough in the trade for three and offered to withdraw in his favor, but that Sprinkle declined the offer and withdrew from the transaction.

"(5) The record shows that after signing the contract of sale and while the mill stock still remained in the possession of the assignees, McCord borrowed $8000 from one Flato in Kansas City with which to pay for this stock, agreeing to hypothecate the same as security, and that on May 27th, the stock still remaining with the assignees, Lawrence

by Ralston's direction indorsed the certificates to Flato and his check to McCord for $8000 was used to pay for the stock, Lawrence testifying that this was the only time he ever had his hands upon this stock. He also testifies that he never had possession of the Steele notes sued for, and having directed Ralston to call on the 'guarantor' he paid very little attention to what became of these items and only signed such transfers as Ralston prepared.

"Ralston testifies that on May 20th he called upon McCord to produce a purchaser for the mill stock, and this he said he would do, and on the 27th directed it to be indorsed to Flato, and when he asked him who the lands should be sold to, he said 'he didn't know yet, but that he would be responsible for it, considered it was sold to him.'

"It appears that McCord in this way became responsible for and paid to himself $8000 for the mill stock and $2500 for the other properties, but as to how and when this last payment was made is not shown.

"(6) The record shows that McCord and Henderson, as assignees, executed a deed conveying to Lawrence seven different parcels of land, among them the two tracts involved in this suit. This deed bears date May 6, 1897, was acknowledged May 7, 1897, and filed for record August 3, 1897, but it is not shown when it was in fact delivered to Lawrence. The consideration recited is the two notes of Lawrence for $8500 due June 1, 1897, and $14,000 due October 15, 1897, and the instrument expressly retains the vendor's lien on all of the lands conveyed, except the two tracts here sued for, on which tracts the vendor's lien was expressly waived.

"The Steele notes were conveyed by a separate instrument dated May 10, 1897, but not acknowledged until March 15, 1898. As to when this document was written and delivered the record is silent. It appears, however, that Steele, on January 4, 1898, conveyed the land, one-half to McCord in satisfaction of his interest in the notes.'

"The record shows a deed from Lawrence to McCord conveying the Jefferson County land, dated May 31, 1898, and a conveyance of the same land by McCord to another party, dated September 19, 1898, for the sum of $2166 paid, of which McCord received net $2000. The title to the other tract of land remained in the name of Lawrence until November 22, 1898, when he executed a deed conveying the same to F. J. and W. R. Fitzwilliams, the only consideration recited being the settlement of the note for $10,000 given by F. M. to W. F. Crawford, and which was secured by vendor's lien on the land.

"(7) We find that when the contract of sale was made with Lawrence, a separate bidder for the interest of 1000 acres in Milam County had indicated to McCord a willingness to take this property at the price asked for it. That this occurred on April 30, 1897, and this party had returned to his home to arrange for the purchase money, and after so arranging for about one-half of the agreed price he heard that the land had been sold. We also find that Flato had indicated a disposition to buy the oil mill stock at one-third of its face value; the record does not

show that these items of property had any connection with each other, or with the balance of the estate, so as to require that all should be sold together, and we therefore find that the giving of the guaranty or assurance by McCord was not necessary under the circumstances to secure a bidder for these properties, since there was no time fixed or required within which the sale should be made.

"(8)    While the record discloses by the direct testimony of W. F. Crawford an agreement entered into between him and McCord prior to the sale, to acquire the property sued for through Lawrence in the manner it was, and a corroboration of this witness by the declaration of McCord to Ralston after the sale that Crawford was interested with him in the lands, and other facts and circumstances in support of this contention, we have not thought it necessary to refer to this branch of the case, preferring to make our findings upon the undisputed facts and the testimony of Ralston and Lawrence and other witnesses produced by the defendant.

"We feel called upon to remark that defendant McCord did not testify at the trial, and the record offers no explanation for his failure so to do.

"All the members of the court agreed to reverse the case, but Associate Jusice Key dissented from the majority of the court wherein the court held that the charge set out in its opinion which was given by the trial court was error.    The majority of the court contended, as explained by its two opinions, that the trial court erred in giving the charge as set out in the opinion, Associate Justice Key contending that there was no error in the charge and that it was properly given.    The three opinions will indicate the views of this court and its members.

"We find that there is evidence in the record justifying the views of the court and each of the members thereof, as stated in the several opinions.    We also desire to state, as a part of this certificate, that during the last term a motion for rehearing was filed and was upon November 18, of the present term by this court, overruled, the court and its members still adhering to the disposition formerly made of the case, and the views expressed in the three opinions.

"In view of the statement as above made, this court through its Chief Justice certifies to the Supreme Court the question of dissent, as stated. Or, in other words, whether the trial court erred in giving the charge set out and discussed in the opinion of the court."

The trial court erred in giving to the jury this charge, referred to in the question: "Although an assignee would have no right to make an agreement with a proposed purchaser of the property of an assigned estate by which the purchaser was bound to sell to such assignee any portion of the property after his purchase, yet such assignee in order to procure an advantageous sale of the property would have the right to guarantee to such prospective purchaser a sale of certain of such assets at a designated price.    So if you believe from the evidence that the defendant McCord, in good faith, for the purpose of having the property

bring a fair price, and not with a view to his own benefit as purchaser thereof, but as an inducement to Lawrence to buy the property at a fair price, caused the statement to be made to Lawrence that a purchaser would be furnished who would take the property off his hands, should he wish to sell it, at the price Lawrence gave for it, then said statement would not vitiate the sale, provided Lawrence was under no promise, express or implied, to allow McCord to take the benefit of his purchase; and if you believe that Lawrence purchased said property under. said circumstances, and afterwards in pursuance of said statement sold a portion of said property to said McCord, said sale to Lawrence and by him to McCord would be valid, and you will find for defendants." Every fact stated in the charge may be true and the plaintiffs be entitled to recover in this action.

If the sale of the property involved in this suit by the assignees Henderson and McCord was in fact made directly or indirectly to McCord, without the consent of the beneficiaries in the trust, then it was voidable at the election of the beneficiaries within a reasonable time without regard to whether the purchase of McCord was made in good faith and for an adequate consideration or not. Shannon v. Marmaduke, 14 Texas, 217; Tenison v. Patton, 95 Texas, 284; Parker v. McKenna, L. R., 10 Ch. App. Cas., 118; Cook v. Berlin Woolen Mill Co., 43 Wis., 433; Davoue v. Fanning, 2 Johns. Ch. Rep., 258; McNutt v. Dix, 83 Mich., 328; Banks v. Judah, 8 Conn., 157; Remick v. Butterfield, 31 N. H., 70; Marsh v. Whitmore, 21 Wallace, 178.

In Davoue v. Fanning, before cited, Chancellor Kent reviewed the authorities upon this question and announced the rule of law applicable to this class of cases in these terms: "Where the trustee himself becomes a purchaser of the trust estate, the cestui que trust may of course come in and set aside the purchase and have the property re-exposed to sale. And it makes no difference whether the sale was at public auction and bona fide for a fair price or otherwise." The case has long been a leading authority upon this question and we find none in conflict with it except two hereafter named.

Our Supreme Court in the case of Shannon v. Marmaduke, before cited, virtually adopts the same rule as that announced by Chancellor Kent, Judge Wheeler for the court saying: "He [the trustee] can not be both buyer and seller at the same time, or connect his own interest in his dealings as an agent or trustee for another. It is incompatible with the fiduciary relation. * * * The rule is founded on the danger of imposition and the presumption of the existence of fraud inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation, and which, in the cases in which such relationship exists, is deemed to be of itself sufficient to create the disqualification." We have cited a small per cent of the cases which support and follow Davoue v. Fanning. Ives v. Ashly, 97 Mass., 198, is cited by counsel for appellee and we have found also the case of Stalling v. Foreman, 2 Hill, Ch., S. C., 405, each of which assert the doctrine that an admin-

istrator who sells by order of a court, subject to confirmation by the court, may in good faith purchase the property or guarantee its purchase by some other person. It is unnecessary to comment upon the cases; it is sufficient for this occasion that they are distinguishable from this case in the fact that they were sales made at public auction and subject to the approval of a court, whereas the sale under investigation was a private sale made by the trustees upon their own judgment and not subject to the approval by any authority.

Counsel for appellees cite the following cases: Erskine v. De La Baum, 3 Texas, 406, in which the issue was the validity of a purchase by the administrator from an heir to the estate. Judge Lipscomb quoted from and approved the opinion of Lord Brougham in Hunter v. Atkins, 3 Mylne & Keene, 113, but that case involved a purchase by a trustee from the beneficiary and is not in conflict with the authorities before cited.

Howard v. Davis, 6 Texas, 174, sought to cancel a purchase by the beneficiary at a sale made by the trustee under a deed of trust.

In Connolly v. Hammond, 51 Texas, 635, the question was whether a sale made by a trustee for his own benefit to another was void or voidable, and it was determined that such sale was prima facie voidable; the conclusion was announced in this language: "The current of authority is that such sales are valid until set aside or repudiated by the cestui que trust, who must assert his right within a reasonable time."

In Hickman v. Stewart, 69 Texas, 255, the plaintiff sought to set aside a sale made by an heir of the estate to the executrix, and Judge Maltbie for the court said: "If the executrix could purchase the interest of Lucretia Hickman in Stone's estate, and acquire a valid title, it must have been on a full, fair and adequate consideration, and there must have been no concealment or withholding of information, or any false or fraudulent representation in reference to the value of the property." Thus it will be seen that the cases in this State cited by the counsel for appellees do not bear upon the question at issue. There is a marked distinction between the rule applicable where the purchase is made by the trustee from the beneficiary, and such case as this, in which the trustee purchased from himself without the consent of the beneficiary. In the former class of cases, if there be fair dealing, full information given by the trustee and an adequate consideration, the sale will be upheld upon the principle that the beneficiary has the power to contract with his agent. In the case before the court the sale was made to McCord without the consent or knowledge of the beneficiaries in the trust, and logically the sale must be voidable at the election of the cestui que trust, because no man can make a contract with himself, and McCord being agent and trustee for the creditors of the estate which he represented, did not have power to make a contract by which he would transfer the assets of that estate to himself. Such a sale might become valid by the approval of the beneficiaries, or through their failure, with

full knowledge of the facts, to assert their right to set aside the sale within a reasonable time.

Was this a sale directly or indirectly by Henderson and McCord to McCord? The terms of the contract with Lawrence were that he should have a given time in which to pay for the property, and upon the payment for each item it should be delivered to him and not before, the property remaining in the possession of the trustees, therefore no title passed to Lawrence until the payment was made. McCord having furnished to Lawrence the money with which the purchase price of the property was paid, when the transfer was made to him the title vested in McCord and not in Lawrence, who was a mere conduit through which that title was conveyed to McCord, the real purchaser. Until the payment the contract with Lawrence was executory, the assignees were charged with its enforcement, and McCord could not acquire the title while his trust relation to the property continued. Parker v. McKenna, L. R., 10 Ch. App. Cas., 118; Cook v. Berlin Woolen Mill Co., 43 Wis., 443. The case of Parker v. McKenna involved a transaction very much like this except in that case there was no understanding between the parties before the sale of the bank shares was made. Briefly stated, the facts were that the directors of a bank agreed to increase its capital, to issue shares and to put them upon the market for sale at a certain premium. A man named Stock contracted to purchase a large number of these shares which he deposited with the directors of the bank to be held by them until paid for he placing a deposit in the bank as a guaranty for his performance of the contract. Finding it difficult to secure funds with which to make payment, Stock offered a part of his shares to four directors of the bank, and they, believing that it was to the interest of the bank for them to do so, purchased the shares from him and paid the money to the bank, taking the shares of stock in their own right. It was held to be a purchase by the directors from themselves and voidable at the election of the bank. The court said: "Now, the rule of this court, as I understand it, as to agents, is not a technical or arbitrary rule. It is founded upon the highest and truest principles of morality. No man can in this court, acting as an agent, be allowed to put himself into a position in which his interest and his duty will be in conflict. If Stock had bought these shares and paid for them, and become the absolute owner of them, the directors were as free as any person in the market to go to Stock and to become the purchasers from him of those shares. The agency in that case would have been over, and there would have been no longer a conflict between interest and duty. Here the agency had not terminated. The court will not inquire, and it is not in a position to ascertain, whether the bank had lost or not lost by the acts of the directors. All that the court has to do is to examine whether a profit has been made by an agent, without knowledge of his principal, in the course and execution of his agency, and the court finds, in my opinion, that these agents in the course of their agency have made a profit, and for that profit they must, in my opinion, account

to their principals." Speaking of the intention of the directors in making the purchase the court said: "Nay, more; I can even imagine the directors might suppose, although in my opinion their supposition would be no justification, that their taking some of these shares from Stock would be beneficial to the bank their principal."

The case of Cook v. Berlin Woolen Mill Co., 43 Wis., 433, is very similar in its facts to Parker v. McKenna, and the Supreme Court of Wisconsin, following the opinion in Parker v. McKenna, said: "The rule forbidding conflict between interest and duty is no respecter of persons. It imputes constructive fraud, because the temptation to actual fraud, and the facility of concealing it, are so great. And it imputes it to all alike who come within its scope, however much or however little open to suspicion of actual fraud. Equity 'does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties.' The principle applies, however innocent the purchaser may be in a given case."

We are of opinion that the facts stated show that the sale of the property in controversy was made to McCord for his own benefit, from which he has derived an advantage, therefore the beneficiaries of the trust are entitled to have the sale set aside or to hold McCord responsible for the benefits derived to himself by the transaction. The charge certified ignored this phase of the case and should not have been given.