**P. P. LANGFORD, III, Appellant,**

v.

**C. D. SHAMBURGER, Jr., Individually and as Trustee, Appellee.**

**No. 16810.**

Court of Civil Appeals of Texas.

Fort Worth.

April 14, 1967.

Rehearing Denied June 30, 1967.

Peery, Wilson & Jameson, and Kearby Peery, Wichita Falls, for appellant.

Nelson, Montgomery & Robertson, and Ernest Robertson, Spence, Martin & Richie, and Howard L. Martin, Wichita Falls, for appellee.

LANGDON, Justice.

OPINION

This is a suit by P. P. Langford, III, appellant, the beneficiary, against C. D. Shamburger, Jr., individually, and as trustee of the P. P. Langford, III Trust and as Independent Executor of the Estates of C. D. Shamburger, Sr., and Mrs. C. D. (Alma) Shamburger, Sr., appellee, for an accounting as to interest on money allegedly borrowed from the trust; for interest on trust funds which were not invested by the trustee; or trust proceeds said to have been commingled with those of the trustee and for profits realized by the trustees through self-dealing with trust funds. Trial was had before a jury, and based upon the jury's findings, the District Court entered judgment for the appellee. We reverse the judgment of the court below and remand the case for a new trial.

C. D. Shamburger, Sr., and his wife, Alma Shamburger, of Wichita Falls, Texas, were the parents of three children as follows:

(1) A daughter, Gracye Shamburger. She married Eugene Clark, Sr. Their son is Eugene Clark, Jr.

(2) A daughter, Dorothy Shamburger. She married Pierce Langford, Jr. Their children are Pierce Langford III (appellant here), Stan Langford and Sue Langford.

(3) A son, C. D. Shamburger, Jr. (appellee).

This was the family status as it pertained to the children and grandchildren of C. D. Shamburger, Sr. and his wife as of November 11, 1943, date of the first trust hereinafter described.

Mr. C. D. Shamburger, Sr., was a very astute and successful businessman, primarily engaged in the cattle and lumber business. The C. D. Shamburger Lumber Co., Inc., of which he owned in excess of 80% of the stock, was the parent lumber company which did business with some 27 branch lumber companies located in North Texas and Oklahoma. He owned ranch lands in excess of 30,000 acres near Texline, Texas, and a ranch at Paducah, Cottle County, Texas. He ran large herds of cattle on these ranches.

Mr. Shamburger, Sr., made numerous gifts of land and personal property to all three of his children at various times. Among the gifts to his daughters, Grayce Clark and Dorothy Langford, were several hundred head of cattle. (Or the gifts were made through them to their respective husbands.) After this gift to them Mr. Shamburger, Sr., prevailed upon his daughters and their respective husbands to create a trust naming him as trustee and placing with him these several hundred head of cattle for the use and benefit of their children, his grandchildren. This trust was created on November 11, 1943. C. D. Shamburger, Jr., was not a trustee or co-trustee under this trust. It was handled exclusively by C. D. Shamburger, Sr.

On December 31, 1946, P. P. Langford, Jr., joined by his wife, Dorothy S. Langford, and by E. B. Clark and C. D. Shamburger, Sr., revoked the prior trust of November 11, 1943. Contemporaneously with their revocation of the 1943 trust, these

same parties created three new trusts out of the assets of the prior trust for the benefit of the three Langford children and a trust for Eugene Clark, Jr. Each of the new Langford trusts had as the corpus of the trust an undivided one-third (1/3) interest in the cattle allocated to the Langford interest under the original trust, together with their increase and any money derived from cattle sales. Each new trust for the benefit of the grandchildren appointed C. D. Shamburger, Sr. and C. D. Shamburger, Jr., as co-trustees, to take possession of and to manage and control the trust properties.

In addition to its other terms, the 1946 trust further provided:

"The trustees and any successor trustee shall at all times maintain adequate and comprehensive records showing all items of trust property, income, expenditures and reserves, which record shall be posted to date and shall accurately show the condition of the trust estate at the close of each calendar month and of each calendar or fiscal year, and such posting shall take place during and at the end of the immediate succeeding calendar month.

"* * *

"No trustee shall ever be liable for any act of omission or commission unless such act is the result of gross negligence or of bad faith or of the trustee's own defalcation, and no trustee shall ever be liable individually for any obligation of the trust."

C. D. Shamburger, Sr., and C. D. Shamburger, Jr., accepted appointment as co-trustees of the trust and agreed to be bound by its terms and provisions in handling the trust estate. The newly created trust was made irrevocable and is subject to our Texas Trust Act, Art. 7425b, Vernon's Ann. Civ.St.

In addition to the property covered by the trust, C. D. Shamburger, Sr., had given each of his grandchildren several thousand acres of land. Appellant, P. P. Langford, III, was given 4,292 acres of grassland near Texline, Texas. Arrangements were made

whereby the co-trustees would run the trust cattle as well as their own cattle on land given to the grandchildren and to pay them, including the appellant, rentals for the use of such grasslands. The ownership of the grassland was completely disassociated from the trust property. From 1950 through 1956 the appellant was paid in excess of $22,000.00 in rental for his land.

The trust acquired a property known as the Shamburger-Langford Lumber Company at Walters, Oklahoma. One-third was owned by the appellant's trust and the other two-thirds by his brother, Stan, and sister, Sue, respectively.

The appellant by his point No. 5 contends that the District Court erred in not sustaining his motion in limine which was directed to the exclusion of evidence that he had been sued in two other cases in which judgments had been taken against him; that his grandfather had made numerous gifts to him and members of his family; that he took an airplane trip to some half a dozen different countries; that he purchased an expensive sports car and camera and had built an expensive lake house. By his points 6, 7, 8, 9, 10, 12 and 14, appellant complains of the court's action in permitting evidence to be introduced before the jury on the matters (above listed) as contained in his motion in limine and in permitting evidence that he had been paid in excess of $22,000.00 in rentals for his land. By his points 15 and 16 he urges error in permitting the defendant to argue such matters.

■ We agree with the appellant. The motion in limine to exclude evidence concerning such extraneous matters should have been sustained. Such evidence and the arguments based thereon had no bearing upon the merits of the case or the ultimate fact issues which the jury had to determine and objections thereto should have been sustained.

At best the trial was involved and highly technical in nature. The extraneous matter introduced before the jury was calculated

to confuse rather than to enlighten it. The only other purpose to be served by such evidence would be to prejudice the minds of the jury by its introduction and to compound this injury by permitting argument emphasizing such prejudice.

Over objection appellee was permitted to prove that the appellant had built a lake house at a cost of $37,956.56 and that appellant's grandfather had paid him rentals in excess of $22,000.00 for his grassland and had given him 4,292 acres of land. This was followed by argument in part as follows:

"C. D. Shamburger, Sr. made the Plaintiff rich, and the evidence shows it. * * * We know one thing. We know that for years after it was given to the Plaintiff. * * * Now this is not part of his trust, mind you; this is outright gift of land to this Plaintiff by his grandfather. * * * P. P. Langford, III is leasing this land that he got as a gift from this grandfather, 4292 acres of grassland, for money that he can use personally. * * * He had given them the land first and then the cattle, they put their own trust cattle on the land, let them graze on the land—neat idea. * * * I have always heard that blood is thicker than water, but evidently it isn't as thick as money, and so here he comes back into court, and is wanting to sue and get more money, not satisfied with what has been given him by his grandfather. * * *"

The further argument was then made, based upon this improper evidence:

"The undisputed testimony shows that that little lake cabin down there cost $37,956.56. Where do you get that figure? Well, you know he had a little dispute with Henry Naylor, and he had to be sued before he would pay Henry Naylor, so there went $11,145.70."

Even after the trial court had ruled out the Naylor judgment, appellee sought to get this evidence before the jury through another means. Appellant was asked if he were willing to pay his account allegedly owed to the Shamburger Lumber Company and, upon his affirmative reply, was then asked if he would pay that account just like he had paid the Naylor account where suit had been brought and judgment taken against him.

Appellee argues that since trust money was advanced to pay these judgments, the trustee is required to account for the money. In his motion in limine, appellant stipulated that he would not make any contention against the appellee for advancing sums of money to pay for such judgments. Appellant also stipulated in open court, outside the presence of the jury, that appellant was making no contention against appellee concerning these judgments or monies advanced to pay them off. Under these circumstances, we are of the opinion that it was clearly error for the trial court to submit issues on these matters to the jury.

Upon retrial of this case, it should be kept in mind that we are here dealing with an express trust as distinguished from an implied or constructive trust. Appellant is not relying upon implications to establish the trust relationship. The relationship of trust is established as a matter of law by the expressed provisions of the instrument itself. The obligations and duties imposed upon him were those imposed upon the trustee of an express trust.

While it is true that the language of the trust instrument in this case purports to relieve the trustee from liability except for gross negligence or bad faith, it is still not incumbent upon the appellant to establish that the trustee was guilty of actual fraud. This is a vital distinction between actual and constructive fraud as is pointed out by Pomeroy in the following language:

"The distinguishing element of actual fraud * * * is always untruth between the two parties to the transaction, so that actual fraud may be reduced to misrepresentations and concealments. This untruth at law * * * must be virtually intentional,—a falsehood; in equity the intention is

not so essential. Untruth is not the distinguishing element of constructive fraud; * * *.

"Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud." Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 3, § 922, 1941.

Story calls it legal or constructive fraud:

"It has been defined as an act which the law declares fraudulent without inquiry into its motive. * * * The necessity of considering this phase of the law arises most frequently in controversies which grow out of dealings between persons when one occupies fiduciary or confidential relations to the other." Story's Equity Jurisprudence, 14th Ed., 1918, Vol. 1, § 370.

 Our Supreme Court of Texas has long recognized the reasons why a beneficiary, such as the appellant in this case, is not required to prove actual fraud to recover from a defalcating trustee:

" 'The rule forbidding conflict between interest and duty is no respecter of persons. It imputes constructive fraud, because the temptation to actual fraud, and the facility of concealing it, are so great. And it imputes it to all alike, who come within its scope, however much or however little open to suspicion of actual fraud. Equity "does not so much consider the bearing or hardship of its doctrine upon particular cases as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties." "The principle applies, however innocent the purchaser may be in a given case." ' " Nabours v. McCord, 97 Tex. 526, 80 S.W. 595, 600 (1904).

In Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, (1945), the Supreme Court again declares that an "intent to defraud" is immaterial to recovery by a beneficiary:

"These matters, intent to defraud and conspiracy and injury or damage to the beneficiary, are immaterial in the determination of liability in this case. * * * It is well settled that in a suit of this kind recovery may be had by the beneficiary even though he has suffered no damages and even though the trustee may have acted in good faith."

In Texas Jurisprudence the rule is summarized as follows:

"Any abuse of a confidential relation, or misappropriation of the property of another or participation therein, or any unconscionable dealing whereby the transfer of property is obtained, constitutes fraud in the eyes of the court of equity." 57 Tex.Jur.2d, p. 461, § 68, Constructive Fraud.

There is no legal principle more consistently applied or more jealously guarded by our Courts than that which applies to the conduct of a fiduciary. Justice Cardozo has perhaps best expressed the rule in this regard:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545–546, 62 A.L.R. 1 (1928).

In Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720 (1938), the late Justice Hickman speaking for our Supreme Court quoted approvingly from Justice Cardozo's Meinhard opinion and pronounced the rule governing fiduciary relationships in this State:

"When persons enter into fiduciary relations each consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by courts of equity. That is a sound rule and should not be whittled down by exceptions."

From what our courts have said, it follows that the question of liability of a defalcating fiduciary can be ascertained as a matter of law without reference to a jury. The exculpatory language of the trust instrument in this case purporting to relieve the trustee from liability except for gross negligence and bad faith cannot be used to excuse the trustee from the misapplication or mishandling of trust funds. Here the trustee borrowed trust funds for his personal benefit and failed to invest substantial sums of trust monies. We think the correct rule of law in this regard is stated in Wichita Royalty Co. v. City Nat. Bank of Wichita Falls, 127 Tex. 158, 89 S.W.2d 394 (1935):

"The trustee's powers are broad, but no * * * stipulation of the declaration is susceptible of the construction that the trustee is privileged to use the trust property or credit for his own benefit. While he is to be held responsible, 'only for his own wilful and corrupt breach of trust and not for any honest error of judgment,' he has no interest in the trust or its property other than a managing interest, and such interest as may be evidenced by a certificate of ownership."

It would be contrary to the public policy of this State to permit the language of a trust instrument to authorize self-dealing by a trustee. Our Texas Trust Act provides:

"Except as provided in Section 11 of this Act, (Corporate trustee depositing trust funds with self) a corporate trustee shall not lend trust funds to itself or an affiliate * * * ; nor shall any noncorporate trustee lend trust funds to himself, or to his relative, employer, employee, partner, or other business associate." Art. 7425b, § 10, p. 228.

Bogert says:

"The trustee may violate the duty of loyalty by lending trust funds to himself. He thus brings into play a conflict of private and representative interests. As lender it is his duty to get the best terms possible as to interest, security, and maturity. As debtor his impulse is naturally in the direction of getting the money at the lowest rate and often on other terms not advantageous to the lender. If he lends to himself, he cannot give an impartial judgment as to the adequacy of the security offered. * * *

"If there is no formal loan but a trustee mingles the trust funds with his own and uses them in his private business, the transaction can be treated as a breach of trust on either of two theories, namely, that of conversion of the trust property, or disloyalty." Bogert Trusts & Trustees, 2d Ed. § 543 (J), p. 548.

In Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377 (1945), the court held:

" 'Trustees cannot make a profit from the trust funds committed to them, by using the money in any kind of trade or speculation, nor in their own business; nor can they put the funds into the trade or business of another, under a stipulation that they shall receive a bonus or other profit or advantage. In all such cases, the trustees must account for every dollar received from the use of the trust-money and they will be absolutely responsible for it if it is lost in any such transactions.' "

It is also incumbent upon the trustee to put trust funds to productive use and the failure to do so within a reasonable pe-

riod of time can render the trustee personally chargeable with interest. The general rule in this regard has been stated as follows:

"Where trust money cannot be applied either immediately or within a short time to the purposes of the trust, it is the duty of the trustee to make the fund productive to the cestui que trust by investment of it in some proper security, and a duty to invest arises by necessary implication from direction to pay over the interest or income." 57 Tex.Jur.2d, § 143, p. 529.

"Unreasonable delay in the investment of funds, where the settlor has directed investment or reinvestment, must be avoided; otherwise the trustee will be personally chargeable with interest." 57 Tex.Jur.2d, § 148, p. 533.

Appellee argues that appellant had knowledge for at least four (4) years that the trust funds were not yielding any interest. Both the four (4) and two (2) year statutes of limitation are urged as a bar to recovery by appellant. The evidence in this case did not justify the submission of any jury issue as to the statutes of limitations. In order to toll the statute, there must be a clear and unmistakable repudiation of the trust by the trustee, and such repudiation must be brought home to the beneficiary. No such repudiation is found in this case. The correct rule in this connection is well stated in 54 A.L.R.2d, § 2 at p. 23:

"The authorities are generally well agreed that for a trustee's repudiation of an express trust to be sufficient to set the statute of limitations in motion in his favor and against the beneficiary, the repudiation must be plain, strong, and unequivocal. * * * Generally speaking, it must be an open repudiation, and to be sufficient and effective must have been brought home to the beneficiary."

In this connection the appellee (trustee) stated unequivocally that he had not repudiated the trust here involved.

Neither would the fact that appellant had knowledge of the trustee's failure to invest trust funds necessarily relieve the trustee from liability. We are not here dealing with an arm's length transaction. The fiduciary relationship must be taken into account in determining whether the beneficiary exercised the requisite degree of diligence. Courseview, Incorporated v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197 (1957).

A witness was permitted to testify as to what the Texline ranch records reflected as to transactions involving the handling of trust property, the allocation of profits and expenses to the various trusts, credits, etc. The record itself (the best evidence) was never produced nor made available to appellant. Should this question arise on retrial such records should be produced. In this connection the pertinent income tax returns should likewise be produced or made available to the extent of relevancy and materiality shown. See Maresca v. Marks, 362 S.W.2d 299, 300–301 (Tex.Sup., 1962), and 20 Tex.Jur.2d 151, § 8 and authorities cited as to limitations placed upon the production of such records.

If it is established on retrial of this cause that the trustee mixed and mingled trust funds with his and the other private funds, then we believe that the burden of proof is on those standing in the trustee's shoes to segregate the privately owned property from that which was held in trust. Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493 (1943). Nor do we think a trustee who has not steadfastly performed his fiduciary duties is entitled to receive any compensation for his services:

" * * * compensation has been refused where the trustee failed to use ordinary care in his administration, * * * failed to keep proper records of trust administration, * * * failed to invest trust property, * * * mingled trust property with his own, * * * was guilty of disloyalty to the beneficiaries in that he acted for his own selfish interest. * * *" Bogert Trusts and Trustees, 2d Ed., "Accounting

and Compensation," § 980 (Power of Court to Reduce or Deny Compensation), p. 404 (408–410).

Reversed and remanded.

## ON MOTION FOR REHEARING

We have carefully examined Appellee's persuasive Motion for Rehearing, but we have concluded that our original opinion is correct. We simply do not believe from the state of this record that the findings of the jury can be relied on because of the admission of certain inflammatory, highly prejudicial and inadmissible evidence concerning the appellant's personal habits. We have attempted to furnish the trial court certain applicable legal principles which should govern him upon retrial of the cause.

We repeat our firm belief that in a suit for an accounting brought by the beneficiary of an express trust, the trial court, without the assistance of a jury, can determine whether the trustee's actions are in violation of the trust instrument. In this connection, we have pointed out the vital distinction between the kind of trust we have in this case (express) and a resulting or constructive trust, the very existence of which depends upon the determination of fact questions.

If the trial court should conclude that fiduciary breaches have occurred, then findings will need to be made as to the accounting aspects of the case. As stated in our original opinion, it appears that the trustee borrowed trust funds for his personal benefit and failed to invest substantial sums of trust moneys. But in view of this record, we are not prepared to so hold as a matter of law and we leave it to the trial court to resolve these questions upon retrial. Certainly the record leaves much to be desired with respect to the amount of recoveries sought by appellant and against whom such recoveries are directed but, as we previously pointed out, the pertinent accounting records should be made available by the appellee upon retrial. Certainly a statement of accounts between the parties such as that

sometimes performed by a court appointed auditor clearly seems appropriate. The accounts between the parties need to be stated in such a way as to permit the trial court to determine what effect the resolvement of the legal issues will have on the case. In this connection, we suggest that resort to pretrial procedure might be extremely helpful to the trial court as well as to the parties.

We are still of the opinion that the trial court's failure to sustain the plaintiff's motion in limine to exclude certain extraneous and prejudicial evidence constituted reversible error, especially since appellant had stipulated that no issues would be raised as to the matters covered in his motion. Counsel for appellee, however, has construed this holding in such a way as to deny him the use of any accounting information which could be used defensively on behalf of the trustee in stating the accounts between the parties. If there are any proper set-offs or credits with which the trustee is entitled, this, of course, should be taken into account by the trial court in his findings. Certainly the $4,077.04 which appellee says appellant owes him because of a transaction completely unrelated to the administration of the trust is one such item to be considered upon retrial. But this does not mean that appellee should be given permission to introduce evidence such as that introduced during the first trial of this case as to the appellant's conduct which has nothing to do with the determination of the issues in the case.

For the reasons stated in our opinion, we do not believe the statutes of limitation can, under the circumstances in this case, bar recovery by appellant. But if the appellant were fully and fairly informed of the trustee's stewardship and appellant failed to make any protest, then a fact question may be presented as to whether appellant acquiesced to the actions of the trustee. If, however, the trustee actually benefited by reason of the confidential relationship, we do not believe that appellant would be es-

topped even though he acquiesced in the actions of the trustee unless such trustee had affirmatively made a full and complete disclosure.

Appellee again directs our attention to the exculpatory language of the trust instrument which relieves a trustee from liability except for gross negligence. Appellee contends that we have in effect held that such exculpatory language is unlawful, thus going contrary to the great weight of authority in this State which has upheld similar exculpatory language in other trust instruments. Our holding is not so broad and should not be so construed. What we have held is that the exculpatory language in the trust instrument here under consideration does not authorize self-dealing by a trustee. In view of the language of Section 10 of the Texas Trust Act, Article 7425b, we further express the opinion that the language of a trust instrument which specifically authorizes self-dealing by a trustee could present a serious question of public policy.

Appellee's motion for rehearing is accordingly overruled. For the reasons stated above, appellant's motion for rehearing is likewise overruled.

## DISSENTING OPINION

## ON MOTION FOR REHEARING

RENFRO, Justice (dissenting).

But for the generosity, foresight and business acumen of appellant's grandfather, there would have been no trust for appellant. Under the management of appellant's grandfather and Uncle, trustees, the trust grew from a value of a few thousand dollars at the time of its creation to a sizeable fortune by the time the trust terminated upon appellant's reaching the age of thirty-five.

After a ten day jury trial, the court entered a fourteen page judgment. On pages 8 and 9 of the judgment (pp. 158–159 of the transcript) appears the following:

"That this is an equitable proceeding; that the evidence presented herein to the Court and Jury clearly demonstrated, and the Jury found, (1) that at all times while C. D. Shamburger, Jr. served as a Trustee of the P. P. Langford, III Trust he acted in good faith in the management of the affairs of the trust, and (2) that neither the said C. D. Shamburger, Jr., his father, C. D. Shamburger, Sr. or the estates of C. D. Shamburger, Sr. and Mrs. C. D. Shamburger, Sr. ever used any trust funds for their own personal benefit and profit. That said findings by the Jury are abundantly supported by the evidence in the case and such findings are adopted by the Court as its own findings with respect to those matters. * * * That the facts admitted in evidence do not support a finding, nor did the jury find, that the Defendant was guilty of gross negligence or of bad faith in the management of the affairs of the trust, and there was no evidence of probative force that the Defendant was ever guilty of any defalcation. That on the other hand the facts support the conclusion that the Defendant, as Trustee, acted honestly and in accordance with his best judgment in the management of the trust affairs, which the Court finds, and that he should be relieved from liability for any claimed violation of the provisions of the Texas Trust Act by virtue of the provisions of Article 7425b–24, Subdivision E thereof; * * *."

The provisions of the Trust Act referred to above provide that a court of competent jurisdiction may, for cause shown, wholly or partly release and excuse a trustee, who has acted honestly and reasonably, from liability for violation of the provisions of the Act.

In my opinion the record in this case is such that the court could properly exercise its authority to release and excuse the trustee from the claimed liability.

I would affirm the judgment of the trial court.