ESTATE OF ROBERTA L. BAILEY, DECEASED, JOSEPH W. BAILEY III, INDEPENDENT EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4861–80.      Filed September 9, 1982.

*Terence J. Murphy, E. Richard Criss, Jr.,* and *J. Scott Morris,* for the petitioner.
*Donna K. Robason,* for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in

---

the amount of $293,499.81 in petitioner's Federal estate tax for the Estate of Roberta L. Bailey who died in 1976. After concessions, the issues for decision are whether Joseph Bailey III has a valid claim against petitioner, his mother's estate, based on his mother's alleged failure to account to him for his share of the estate of his father (who died in 1943) and, if so, the amount of that claim.

## FINDINGS OF FACT

Joseph W. Bailey III (Joseph III), independent executor of the Estate of Roberta L. Bailey, resided in Dallas, Tex., when he filed the petition in this case. Roberta L. Bailey (Mrs. Bailey), the decedent, was domiciled in Texas on the date of her death, September 6, 1976. A timely Federal estate tax return was filed with the Internal Revenue Service Center, Austin, Tex.

Mrs. Bailey died testate, making a few specific bequests of jewelry valued at $3,675 and bequeathing the remainder of her estate to her only child, Joseph III. Joseph III was named in his mother's will as independent executor and was so appointed by Probate Court Number 3, in Dallas County. On the estate tax return, the gross estate was valued (as of the alternate valuation date) at $1,595,491.03, and a deduction of $765,282.50 was taken, allegedly representing the value of a claim of a constructive trust held by Mrs. Bailey for Joseph III. The Probate Court formally allowed the claim but did not pass on the facts upon which deductibility of the claim depends because there was no adverse party objecting to the constructive trust deduction.

Mrs. Bailey was married in 1924 to Joseph W. Bailey, Jr. (Mr. Bailey), and Joseph III, their only child, was born in 1926. Mr. Bailey was a lawyer and a politician, having practiced law in Dallas nearly all his professional life, except for a term he served as a U.S. Congressman from 1932 to 1934. He ran for the U.S. Senate in 1936 but was not elected. His father (Joseph III's grandfather), Joseph W. Bailey, Sr., served as a U.S. Senator for a number of years in the early part of this century.

Mr. Bailey died in an automobile accident on July 17, 1943, while serving as a captain in the U.S. Marine Corps. He left no will. No letters of administration were granted, and Mrs.

Bailey discharged the community debts without the necessity for administration.

Mrs. Bailey, as "surviving wife of Joseph Weldon Bailey, Jr.," filed an estate tax return for her husband's estate listing property valued at $43,762.61, with deductions of $7,687.79. All of this property was community property under Texas law; Mr. Bailey possessed no separate property. Mr. Bailey's reported property consisted of the following:

| Item | Reported value |
| --- | --- |
| Residence .......................................... | $15,000.00 |
| Reilly Oil Co. stock—110 shares .............. | 110.00 |
| Collins Morris Shoe Co. stock—200 shares | 0 |
| Series E bonds .................................... | 150.00 |
| Mortgage and cash .............................. | 8,622.71 |
| Demand note of C. J. Shaeffer ............... | 11,376.77 |
| Miscellaneous property ......................... | 8,503.13 |
| Total ................................................ | 43,762.61 |
| Deductions ........................................ | 7,687.79 |
| Net estate ......................................... | 36,074.82 |

The return also listed numerous stocks described as Mrs. Bailey's separate property. It omitted 35 shares of Liggett & Myers stock standing in Mr. Bailey's name and having a total value of $2,467.50 (including Mrs. Bailey's community share).

Following an audit, the Internal Revenue Service (IRS) took the position that the stock listed in the return as Mrs. Bailey's property, to the extent acquired with dividends, was community property. Mrs. Bailey argued that she and her husband had agreed that stock acquired with dividends would be her separate property.[1] Mrs. Bailey and the Internal Revenue

---

[1] A letter dated Sept. 20, 1943, from one of Mrs. Bailey's attorneys to the person preparing the estate tax return explains her position as follows:

"Mrs. Bailey advises us that at the time she married Mr. Bailey she had a number of shares of stock in the British American Company, which had been given her by her mother and which were, in consequence, her separate property; that after marriage she sold this stock and bought shares of Liggett & Meyers [sic] Tobacco Company. This stock in turn would constitute her separate property. Thereafter, from time to time she collected the dividends from the Liggett & Meyers [sic] stock, and these dividends would ordinarily, under our law, constitute community property. Mrs. Bailey advises, however, that there was an agreement between herself and Mr. Bailey that these dividends were to be her own separate property. She handled all matters in connection with them and used a portion of these dividends to purchase additional stock. If the dividends were in fact given her by Mr. Bailey so as to

Service finally agreed to increase the value of the estate's assets by $67,016.07 and to increase the deductions by $239.54. Of the $67,016.07 increase, $54,751 represented Mr. Bailey's one-half community interest in stocks and bonds that stood in Mrs. Bailey's name. This figure was arrived at by subtracting from the cost of these stocks and bonds ($395,841.95) an amount equaling funds attributable to Mrs. Bailey's separate property ($286,339.96). The remaining $109,501.99 of the purchase price was then attributed to the community, and one-half of this difference was included in Mr. Bailey's estate.

Based on this settlement with the IRS, the parties have agreed, for the purposes of the instant case, that Mr. Bailey's net interest in the community estate (without regard to the estate tax and related expenses) as of the date of his death on July 17, 1943, was $73,396.68.[2]

As the settlement of Mr. Bailey's estate neared final resolution, Mr. J. P. Jackson, one of Mrs. Bailey's attorneys, wrote a letter dated November 15, 1946, which was found by Joseph III in his mother's safe-deposit box after her death (the Jackson letter). The letter reads in part as follows:

The [IRS] Agent has accepted our theory that since these stocks were purchased in the name of Mrs. Bailey and were purchased with community funds, her separate estate is indebted to the community estate in this amount. This more or less arbitrary handling of the items in dispute eliminated the necessity of going into the question of gift tax liability, and served to confirm in Mrs. Bailey the ownership of these shares acquired during marriage subject only to a charge in favor of the community estate of approximately $109,502.00, one half of which, representing the decedent's interest, was held to be taxable. * * *

One question may arise in connection with this tax settlement. Inasmuch as the son inherited one-half of the community property, and Mrs. Bailey took one-half, representing her community interest, there is a question in my mind as to whether or not it may not be to the interest of the parties to give effect to the tax settlement in the final administration of the estate. * * *

I realize of course that the more or less arbitrary basis of settlement with the Agent is not necessarily controlling between the parties, but if Mrs.

---

constitute her separate property, then the additional stock purchased with them would likewise be separate property."

[2]The parties include in Mr. Bailey's 1943 net estate 13.83 shares of Polaroid stock valued at $666.88 and 363.25 shares of Liggett & Myers stock valued at $29,541.47. By 1961, one share of Polaroid stock owned in 1943 had grown, through stock splits and dividends, to 27 shares. Mrs. Bailey's estate also included shares of Polaroid and Liggett & Myers stock.

* * * [Bailey] cares to do so, I feel that she could adopt the settlement as the basis for actual accounting and thereby get into her son's hands these values without gift tax, and thus reduce her estate against subsequent estate tax liabilities by these amounts.

An affidavit of heirship was later filed by Mrs. Bailey (then Roberta L. McKinney, see *infra*) and was recorded on May 23, 1949, in the deed records of Dallas County. This affidavit states that Mr. Bailey left no will, and that Joseph III was his only child. Under Texas laws of descent and distribution, Joseph III was entitled to his father's one-half of the community property at his father's death. Tex. Rev. Civ. Stat. art. 2578 (1925) (repealed effective Jan. 1, 1956). There is no evidence that Mrs. Bailey set up any separate account or trust for Joseph III's benefit.

Prior to his father's death, Joseph III had spent considerable time away from home. From the ages of 11 to 17, he attended boarding schools in various parts of the country, thus living away from home for 9 months of the year. In 1943, Joseph III returned to Dallas, and continued his high school education while living at home. Because Mr. Bailey was in the Marine Corps, Joseph III saw his father only occasionally, particularly on weekends during this period.

Following his father's death and upon virtual completion of his secondary education, Joseph III entered active duty with the Marine Corps in June 1944. Except for a brief leave, Joseph III spent the next 2 years with the Marines in the Pacific area. He returned to Dallas in August 1946 and resided with his mother and her then husband, William "Bud" McKinney (Mr. McKinney), from whom she was divorced in 1950. Supported partially by the G.I. Bill and partially by his mother, Joseph III attended Southern Methodist University from 1946 to 1949. After working as a car salesman in Dallas, he joined the Air Force in 1953. In 1954, after he returned to Dallas, Joseph III married and moved into his own house.

In 1949, when he was 23 years old, Joseph III joined Mrs. Bailey (then Mrs. McKinney) and Mr. McKinney in signing a deed selling the house in which the Bailey family had resided. Under Texas law, Joseph III owned his father's one-half interest in this community property asset. Joseph III did not receive any money from the purchaser as a result of this sale.

Between 1951 and 1961, Mrs. Bailey made the following transfers to Joseph III, as evidenced by U.S. gift tax returns:

| Date | Description of gift | Value at date of transfer |
|---|---|---|
| 1951 | Cash ...................................................... | $4,000.00 |
| | Republic National Bank stock rights ......... | 462.40 |
| 1952 | Cash ...................................................... | 5,495.39 |
| | Republic National Bank stock rights ......... | 510.51 |
| | 2,000 shares Liggett & Myers common stock .............................................. | 139,750.00 |
| | Life insurance policy ............................. | 9,322.00 |
| 1958 | 47 shares of Republic National Bank stock ................................................. | 2,972.75 |
| | 1954 Cadillac ...................................... | 1,500.00 |
| 1960 | Cash ...................................................... | 25,000.00 |
| | Notes of Joseph Bailey, Inc., forgiven ........ | 80,150.00 |
| | Notes of Joseph Bailey forgiven ............... | 71,500.00 |
| | Interest on notes .................................. | 4,947.44 |
| 1961 | Cash ...................................................... | 85,000.00 |
| | Indebtedness forgiven ............................ | 67,000.00 |
| | 1,500 shares Republic National Bank stock ................................................. | 104,250.00 |
| | 1,000 shares Polaroid common stock .......... | 181,250.00 |
| | 1,500 shares General Telephone & Electronic common stock ....................... | [1]45,468.75 |
| | 400 shares Liggett & Myers .................... | 35,925.00 |
| | One-half interest in 6 acres in California ......................................... | 65,000.00 |
| Total | ...................................................... | 929,504.24 |

[1] In the stipulation, the value of 1,500 shares of General Telephone & Electronic common stock appears as $47,468.75. The gift tax return, however, shows this value as $45,468.75. The stipulation's total value of all gifts reflects the latter figure, and we use the $45,468.75 value for our findings of fact.

Some of these "notes * * * forgiven" represented loans made by Mrs. Bailey to assist Joseph III in his various business enterprises (e.g., car sales, real estate, construction). Other than making these loans and gifts, Mrs. Bailey did not

participate in Joseph III's business affairs, nor did Joseph III involve himself in Mrs. Bailey's business affairs.

After his mother's death in 1976, Joseph III discovered in Mrs. Bailey's safe-deposit box numerous papers, including an affidavit of heirship. On the estate tax return for Mrs. Bailey's estate, a deduction in the amount of $765,282.50 was claimed; this amount allegedly represented the 1976 value of a constructive trust of Joseph III's share of his father's 1943 net estate.[3] Respondent disallowed the deduction.

## OPINION

Joseph Bailey, Jr., decedent's husband, was domiciled in Texas in 1943 when he died intestate, leaving community property. Under Texas law, his and Mrs. Bailey's only child, Joseph III, then 17 years of age, became entitled to one-half of that property (worth a maximum of about $73,000), and Mrs. Bailey owned the other half. Mrs. Bailey took over the management, control, and disposition of the estate as community survivor, without formal administration. She assisted Joseph III, financially, in completing his education, and between 1951 and 1961, transferred to him over $929,000 worth of property, more than 12 times the maximum value in 1943 of his share of his father's estate. Moreover, in her will, Mrs. Bailey left Joseph III practically all of her estate (except about $3,600), valued at over $1,500,000. Nonetheless, Mrs. Bailey's estate, through Joseph III as independent executor, here alleges that Mrs. Bailey abused her fiduciary powers as community survivor and defrauded Joseph III by failing to account to him for his share of his father's estate. On this ground, decedent's estate seeks a deduction of $765,282.50 allegedly representing the 1976 value of Joseph III's claim against her estate.

Section 2053(a)(3)[4] permits a deduction from the value of a

---

[3]Petitioner calculated the 1943 net interest of approximately $73,000 as worth about $765,280 at the date of Mrs. Bailey's death. Respondent, while not conceding the existence of a constructive trust, independently established Mr. Bailey's net estate as worth approximately $73,000 but differs from petitioner by computing the 1976 value of such an interest at either about $212,809 or about $162,785 (depending on whether the house and traceable stock are included). Given our resolution of the issues, we make no finding concerning the value of Mr. Bailey's estate in 1976.

[4]All section references are to the Internal Revenue Code of 1954 as in effect during the tax

decedent's gross estate for such claims against it "as are allowable by the laws of the jurisdiction, * * * under which the estate is being administered." Petitioner contends that a Texas court would declare that Mrs. Bailey held property as a constructive trustee for Joseph III to the extent of the $765,282.50 claimed as a deduction.[5] Respondent argues that petitioner has not shown facts necessary to establish a constructive trust; that, if a constructive trust once existed, Joseph III's claim against his mother was extinguished by the 1951 through 1961 property transfers to him; and further that, if a trust existed, Joseph III's claim was barred by the Texas 4-year statute of limitations prior to Mrs. Bailey's death.

Because section 2053 adopts State law as the criterion for determining the deductibility of claims against an estate, we must view Joseph III's claim as if this Court were a Texas court deciding a hypothetical suit brought by him against his mother immediately prior to her death. We must decide whether a Texas court would hold that she defrauded him of his inheritance, unjustly enriched herself, or abused her fiduciary powers as community survivor by failing to transfer to him his share of his father's estate in such manner that justice requires the imposition of a constructive trust in his favor.[6]

We find that Joseph III's claim lacks merit. In essence, we agree with respondent's first two arguments, listed above. Petitioner has not shown that Mrs. Bailey at her death held

---

year in issue, unless otherwise noted.

SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

(3) for claims against the estate * * *

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

[5]Technically, petitioner's constructive trust claim would appear to be not for a deduction as such but for an exclusion from the gross estate of the amount subject to the alleged constructive trust. In other words, petitioner's allegation is that Joseph III, in equity, owned approximately $765,000 of the property included in his mother's estate. Cf. Guitar v. United States, 135 F. Supp. 509 (N.D. Tex. 1955).

[6]The parties have stipulated that:

"The probate court did not pass upon the facts upon which deductibility of * * * [Joseph III's] claim depends because there existed no adverse party to object to the deduction taken for the constructive trust."

Petitioner does not rely upon the Probate Court's action to support its claim in the instant case. See sec. 20.2053–1(b)(2), Estate Tax Regs.

property as constructive trustee for Joseph III's benefit. We do not reach the statute of limitations argument.

Texas law as it existed in 1943, when Mr. Bailey died survived by Mrs. Bailey and Joseph III, a minor, provided that his share of the community property would descend to Joseph III. Tex. Rev. Civ. Stat. art. 2578, *supra*.[7] On Mr. Bailey's dying without a will, as pointed out by petitioner, Mrs. Bailey had three statutory choices for handling Joseph III's share of the community property. First, she could have had the estate formally administered (Tex. Rev. Civ. Stat. art. 3290, et seq. (1925) (repealed effective Jan. 1, 1956)); second, she could have formally qualified as community survivor (Tex. Rev. Civ. Stat. art. 3661, et seq. (1925) (repealed effective Jan. 1, 1956)); or, third, she could have sought appointment as guardian of the estate of Joseph III, her minor child (Tex. Rev. Civ. Stat. art. 4102, et seq. (1925) (repealed effective Jan. 1, 1956)); *Grebe v. First State Bank of Bishop*, 136 Tex. 226, 150 S.W.2d 64, 66 (1941).

In addition, Mrs. Bailey had the recognized right as an "unqualified" community survivor to administer the community property for the payment of community debts, without any supervision of the Probate Court. See, e.g., *Clemmons v. McDowell*, 5 S.W.2d 224, 227 (Tex. Civ. App. 1927), affd. 12 S.W.2d 955, 956 (Tex. Com. App. 1929). She chose this course. But after the community estate had been fully administered and all debts had been paid, she was not entitled to use Joseph III's share of the community assets for her own private use; she held his share in a form of trust for the benefit of Joseph III. *Grebe v. First State Bank of Bishop*, 150 S.W.2d at 67. Mrs. Bailey, was not, however, technically a trustee; she was a tenant in common with Joseph III and had broad powers in her own right with respect to the community property. *Berkley v. Neely*, 6 S.W.2d 430, 431 (Tex. Civ. App. 1928); O. Speer, Law of Marital Rights in Texas sec. 656, at 824–825 (3d ed. 1929).[8]

---

[7]The citations to Texas Revised Civil Statutes are to the provisions in effect during the pertinent period. Most of the cited provisions have been carried forward into the Texas Probate Code.

[8]In O. Speer, Law of Marital Rights in Texas sec. 656, at 824–825 (3d ed. 1929), it is stated:

"Where there are surviving children, he [the surviving spouse] is owner in his own right of the half, and for the purpose of adjusting debts and encumbrances, entitled to the possession

A surviving spouse is "not entitled to use the funds or community assets for * * * [her] own private use." *Grebe v. First State Bank of Bishop*, 150 S.W.2d at 67. Texas courts have held that where a surviving spouse fails to transfer a child's inheritance and uses the child's share of the assets (or their proceeds) for his own benefit or to the detriment of the child, a constructive trust may arise to redress the injury and prevent unjust enrichment. *Hand v. Errington*, 242 S.W. 722 (Tex. Com. App. 1922); *Spencer v. Pettit*, 2 S.W.2d 422 (Tex. Com. App. 1928) (holding approved); see *Thames v. Johnson*, 614 S.W.2d 612 (Tex. Civ. App. 1981); *Born v. Bluestein*, 220 S.W.2d 345 (Tex. Civ. App. 1949). See also Restatement, Restitution sec. 160 (1937); 5 A. Scott, Trusts sec. 462, at 3413 (3d ed. 1967). A constructive trust is not an actual trust but is a remedial tool, a "fiction imposed as an equitable device for achieving justice." *Healy v. Commissioner*, 345 U.S. 278, 282 (1953). As explained by the Supreme Court of Texas, a constructive trust is designed to remedy situations in which a wrongdoer "holds funds which in equity and good conscience should be possessed by another." *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). According to the Texas cases, moreover: "Equity is reason. * * * it looks through superficial fictions and acts upon the facts"; and, in those words so familiar to tax law, it "regards the substance and not the form." *Peckham v. Johnson*, 98 S.W.2d 408, 416 (Tex. Civ. App. 1936), affd. 120 S.W.2d 786 (Tex. 1938).

Although we have only the self-interested testimony of Joseph III on which to base our findings, it appears that Mrs. Bailey's failure to segregate Joseph III's share of the 1943 community property from her own estate and to account to him for her stewardship of his share was a technical violation of her legal duty as community survivor. If Joseph III had suffered any resulting injury, her action might have constituted what the Texas courts have referred to as "constructive or legal fraud." See *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964); *Carnes v. Meador*, 533 S.W.2d 365, 372 (Tex. Civ.

---

of the whole for a reasonable time. He has the right to administer the community property for the payment of community debts, without any supervision of the probate court. * * * His holding is similar to that of any other trustee * * * The survivor is not, however, technically a trustee; he has very broad independent powers. [Fn. refs. omitted.]"

App. 1975). But petitioner has not shown that Mrs. Bailey caused Joseph III to suffer any unfair loss (see, e.g., *Grebe v. First State Bank of Bishop, supra*), or that Mrs. Bailey's technical wrong was one needing a remedy, or that she unjustly obtained a profit from her "wrongdoing" (see, e.g., *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401 (1960); *Thames v. Johnson, supra*). Indeed, the facts of record show that Joseph III received from his mother more than his full share of his father's estate and beyond that, he was the beneficiary of a devoted and generous mother. Because of the absence of damage to him, her technical breach of her fiduciary duty to make a formal account of his share of the 1943 community estate never "ripened" into a constructive trust.[9] See *Linder v. Citizens St. Bank of Malakoff, Tex.*, 528 S.W.2d 90, 94 (Tex. Civ. App. 1975).

The relationship between Mrs. Bailey and Joseph III, according to the implications of his testimony, was always close and supportive of his welfare. The record contains not the slightest suggestion that Mrs. Bailey ever—intentionally or unintentionally—harmed Joseph III or his interests in any way, that she failed at any time to act in his best interests, or that she ever denied him any request for financial support. Her enduring concern is evident in her leaving him, in her final will and testament, virtually her entire estate, amounting to over $1,500,000.

During her lifetime, beginning in 1951 and continuing through 1961, Mrs. Bailey made a series of transfers of cash and other property to Joseph III, as described in our findings. The total value of these transfers exceeded $929,000, over 12 times the maximum net value in 1943 of Joseph III's share of his father's community property. The transfers included more than $338,000 in cash and forgiven indebtedness alone, a sum over 4 times the amount of Joseph III's share. The transfers also included 1,000 shares of Polaroid stock with a value of $181,250 in 1961, compared with the 13.83 Polaroid shares,

---

[9]Petitioner cities two cases (*Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377 (1945), and *Langford v. Shamburger*, 417 S.W.2d 438 (Tex. Civ. App. 1967)), for the proposition that no showing of damage or fraud is necessary in the case of a "defalcating" trustee. These cases are inapposite. They concerned express trustees, and in both the courts specifically stated that they were not dealing with questions of fraud or constructive trusts. *Slay v. Burnett Trust*, 187 S.W.2d at 389; *Langford v. Shamburger, supra* at 442.

valued at $666.88, treated by petitioner here as part of Mr. Bailey's (and hence Joseph III's) share of the community assets in 1943. True, each 1943 share of Polaroid stock had increased, due to stock splits and dividends, to 27 shares by 1961, but Mrs. Bailey's 1961 transfer of 1,000 shares far exceeded the number of shares attributable to the 13.83 shares in 1943 (13.83 × 17 = 373.41). Compared with the 363.25 shares of Liggett & Myers valued at $29,541.47 treated by petitioner in the instant case as part of Mr. Bailey's share of the community property in 1943, Mrs. Bailey transferred to Joseph III 2,000 shares of that stock with a value of $139,750 in 1952 and 400 shares with a value of $35,925 in 1961.

Because equity looks to reality rather than fiction and to substance rather than form (*Peckham v. Johnson*, 98 S.W.2d at 416), these transfers to Joseph III accounted to him many times over for any claim he may have had for his share of his father's estate. Significantly, the transfers started in 1951 when Joseph III was 25 years of age, shortly after he had completed college. This was a logical, and traditional, time for Mrs. Bailey to settle with him for any claim he may have had. Before that time, he was for the most part in school or the military service; moreover, in or around 1951, he was beginning his business career. Her transfers ceased in 1961, when Joseph III was 35 years of age. We think any Texas court would hold that the transfers were intended to be, and were, a generous settlement of any claim he may have had, and they undercut completely Joseph III's constructive trust claim.

It is true that Joseph III's testimony, the only evidence before the Court on the point, does not show that these transfers were accompanied by a specific accounting. But a community survivor's "account need not be in detail, but only for the aggregate." L. Simpkins, Texas Family Law sec. 42:18, at 316 (I. Speer 5th ed. 1977). As explained in *Strickler v. Kassner*, 64 S.W.2d 1025, 1027 (Tex. Civ. App. 1933), the survivor—

is not required to give an account of each transaction in detail as other trustees, but is only required to account in good faith for the aggregates or surplus of the community funds after the payment of the debts and expenses. 14 Tex. Jur. 616; * * *

According to *Leatherwood v. Arnold*, 66 Tex. 414, 1 S.W. 173, 174–175 (1886), the "responsibility of the survivor can only be

fixed by aggregates," and "When called upon to account, the aggregates alone will be dealt with." For "Whether he has done well or ill depends on no particular act, but on the general result." See also *Brown v. Elmendorf*, 87 Tex. 56, 26 S.W. 1043, 1044 (1894); *Long v. Moore*, 19 Tex. Civ. App. 363, 48 S.W. 43, 46 (1898); cf. *Nowlin v. Clary*, 178 S.W. 571, 573 (Tex. Civ. App. 1915). Certainly, a 12-for-1 settlement meets that standard.[10]

Petitioner next argues that the 1951 through 1961 transfers did not extinguish Joseph III's claim to his father's estate because respondent failed to prove that these transfers were made from the community property and were not independent gifts of Mrs. Bailey's separate property. The parties spar over which one has the burden of proving the derivation of the transferred assets, and over the applicability of certain presumptions.[11] While Texas rules on burden of proof, commingling separate and community property, and presumptive extinguishments or advancements may be useful in resolving disputes between several individual claimants to an estate, we do not think they apply here. In a hypothetical suit by Joseph

---

[10]*Brown v. Elmendorf*, 87 Tex. 56, 26 S.W. 1043 (1894), involved a suit to recover a one-half interest in certain land that had been owned by Mr. and Mrs. Brown as community property. After Mr. Brown's death in 1866, his widow sold the land and, upon her death 3 years after her husband's, their children claimed title to an undivided one-half interest in the land, representing their father's community property interest, of which they were the heirs. The Texas Supreme Court noted that at their mother's death, the children received property exceeding the 1866 value of their father's one-half interest in the community property, and held that "The fundamental right of the heirs in such a case is to receive one-half in value of what remains of the community estate after the payment of community debts, if any." If the heirs "come into possession" of this one-half in value, then "it is just to hold that they have acquired all that they can equitably demand from the common estate." "In such a case they are not prejudiced by the result, and although their strict legal rights [to have a partition through legal proceedings] may not have been respected in the disposition of the property, yet when they have received a share fully equal in value to their interest they should not be heard to complain. Courts of equity are loath to disturb an adjustment of property rights made between members of a family." *Brown v. Elmendorf*, 26 S.W. at 1044.

[11]We note that Texas case law concerning lax trustees is fraught with presumptions. There is, for example, a presumption that if a trustee commingles trust property with his own, all the commingled property is considered trust property. See, e.g., *Eaton v. Husted*, 141 Tex. 349, 172 S.W.2d 493, 498–499 (Tex. 1943). But, should a trustee make an expenditure out of this fund, another presumption deems such expenditure as being made out of his own money. See, e.g., *Batmanis v. Batmanis*, 600 S.W.2d 887, 890 (Tex. Civ. App. 1980). When dealing with constructive trusts, equity takes a flexible approach (see *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974)), and it will "circumvent technical legal principles of title and ownership in order to reach a just result." *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 853 (Tex. Civ. App. 1979).

III against Mrs. Bailey to establish a constructive trust, we think a Texas court would have brushed aside those "technical legal principles" in determining whether Mrs. Bailey was unjustly enriched and whether Joseph III was injured at the hands of his mother. See *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 853 (Tex. Civ. App. 1979). When the court learned that Mrs. Bailey transferred to Joseph III at least $12 for each $1 claim he could possibly have established, we think it would have concluded that Mrs. Bailey did not "hold funds which in equity and good conscience should be possessed" by Joseph III. *Meadows v. Bierschwale*, 516 S.W.2d at 131.

Petitioner dismisses the 1951 through 1961 transfers on the ground that Mrs. Bailey filed gift tax returns with respect to those transactions and argues that it would, therefore, be illogical to treat those transfers as made in extinguishment of his claim to one-half of his father's estate. But it would be far more illogical, as we view the evidence, to hold that Mrs. Bailey made gifts to Joseph III of $929,000 of her own separate property and, at the same time, concealed from him, and defrauded him of, his alleged $73,000 share of his father's estate. We do not have Mrs. Bailey's explanation of the gift tax returns, but she may have thought she had given Joseph III the balance of his share of the community estate in the form of support while he was a minor and during the 4 years he lived with her while attending college and was, accordingly, required to file gift tax returns with respect to the transfers.

Mrs. Bailey apparently considered that her husband's estate was worth considerably less than what her attorney referred to as the "more or less arbitrary" value negotiated with the IRS. The estate tax return she filed showed a net estate of only about $36,000, and from this sum, numerous subtractions could be made. The principal asset of the estate was the family residence, and, in 1949, the 23-year-old Joseph III joined in a deed conveying it without claiming any of the proceeds, thereby waiving any right to them.[12] Mrs. Bailey, moreover, may have believed she was entitled to a widow's allowance

---

[12]We find Joseph III's testimony that he did not know he owned an interest in the property and was told—and believed—that he had to sign the deed because he lived there quite incredible. After all, Joseph III's grandfather was a U.S. Senator for many years, and his father was a prominent Dallas lawyer and former Congressman. The testimony does not suggest that he knew his mother had a separate estate. His commonsense must have told

and, for Joseph III, a minor's allowance out of the community estate (Tex. Rev. Civ. Stat. arts. 3476, 3477 (1925)) (repealed effective Jan. 1, 1956); she may also have offset the costs of supporting Joseph III while he lived at home while attending college. In addition, the Shaeffer note included on the return at $11,376.77 was settled for $7,550. And the estate tax liability of $5,404 was chargeable to Mr. Bailey's community property. The record does not show the amounts of the attorneys' and accountants' fees and other expenses incurred in settling the estate tax controversy over Mr. Bailey's estate, but negotiations lasted many months and required extensive accounting research to trace the stock ownership. The fees were no doubt substantial. It is entirely probable that Mrs. Bailey believed that these various charges and offsets exceeded the balance of Mr. Bailey's estate, and that subsequent, additional transfers to Joseph III were gifts to him.

In addition, there is no evidence that Mrs. Bailey ever actually believed that the $54,751 worth of stock standing in her name (included by the settlement in her husband's estate) was actually community property. To refute the IRS's claim to an estate tax deficiency, Mrs. Bailey maintained that she and Mr. Bailey had agreed that all stock bought with dividends on her stock would be her separate property, and there is no evidence that she receded from that position. The agreement treating the $54,751 worth of stock as part of Mr. Bailey's estate was described in the Jackson letter as "a more or less arbitrary basis of settlement." Also, the Jackson letter states that the legal theory accepted by the IRS was that she owned the stock but owed the community estate $54,751. Had she failed to file gift tax returns with respect to her transfers to Joseph III, she would have been required to deny the accuracy of the estate tax return she originally filed and to repudiate her contention that she and her husband had agreed that the stock bought with dividends from her stock would be her separate property. We think it fully understandable that she filed gift tax returns on the transfers rather than face another expensive controversy with the IRS.

---

him that his father contributed something to the acquisition of the family residence and that he, Joseph III, was required to sign the deed of conveyance because of his inherited interest.

Finally, there is no evidence to show that she ever accepted the suggestion by Jackson, her attorney, that "she could adopt the settlement as the basis for actual accounting and thereby get into her son's hands these values without gift tax." There is nothing in the record to suggest that the attorney who gave that advice participated in any way in the preparation of the gift tax returns. In fact, the 1951 and 1952 gift tax returns show they were prepared in St. Louis, and the returns for 1958 and 1960 show they were prepared in New York. The 1961 return was prepared in Dallas but not by the law firm that handled the 1943 estate tax controversy. In short, the fact that Mrs. Bailey filed gift tax returns is susceptible to numerous explanations which by no means bolster petitioner's equitable argument.

We think that a Texas court in an adversary proceeding would have emphatically denied any request by Joseph III to impose a constructive trust on part of Mrs. Bailey's estate. Mrs. Bailey was not unjustly enriched. Joseph III received from her transfers with values far exceeding his share of his father's estate. She more than accounted for his statutory share. Joseph III has suffered no inequity. Rather he has been the beneficiary of a most generous parent.

Due to concessions,

*Decision will be entered under Rule 155.*