ESTATE OF ROBERTA L. BAILEY, DECEASED, JOSEPH W. BAILEY, III, INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Bailey v. Commissioner
Docket No. 4861-80.
United States Tax Court
T.C. Memo 1985-274; 1985 Tax Ct. Memo LEXIS 359; 50 T.C.M. (CCH) 82; T.C.M. (RIA) 85274; June 6, 1985. Terence J. Murphy,E. Richard Criss, Jr., and J. ScottMorris, for the petitioner. Donna K. Robason, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case is before the Court on remand from the Court of Appeals for the Fifth Circuit. The issues for decision are: 1. Whether the claim asserted by Joseph W. Bailey III against petitioner, his mother's estate, after her death in 1976, for a constructive trust representing the value of his share of the estate of his father, who died in 1943, is barred under Texas law by the applicable 4-year statute of limitations; and 2. If such *360 claim is not barred, the amount of the claim allowable under section 2053(a)(3). [1]
The parties have agreed that no additional evidence or briefs are necessary for a determination of the issues stated above. Thus, we have here recast all findings essential to the disposition of the issues before us based on the evidence contained in the original record. FINDINGS OF FACT Roberta L. Bailey (Mrs. Bailey), the decedent whose estate is petitioner herein, and Joseph W. Bailey, Jr. (Mr. Bailey), were married in 1924. Their only child, Joseph W. Bailey III (Joseph III), was born in 1926. Mr. Bailey was a lawyer and a politician; he practiced law in Dallas, Texas, nearly all his professional life, except for one term that he served as a U.S. Congressman from 1932 to 1934. Mr. Bailey ran for the U.S. Senate in 1936, but was not elected. His father, Joseph W. Bailey, Sr. (Joseph III's grandfather) served as a U.S. Senator from Texas for a number of years in the early part of this century. On July 17, 1943, when Joseph III was 17 years old, Mr. Bailey died in an automobile *361 accident while serving as a captain in the U.S. Marine Corps. He left no will. At the time of his death, Mr. Bailey's estate consisted entirely of community property; he had no separate property. Under Texas laws of descent and distribution, Joseph III, Mr. Bailey's only child, was entitled to his father's one-half share of the community property as of the time of his father's death. Tex. Rev. Civ. Stat. art. 2578 (1925) (repealed effective Jan. 1, 1956). For purposes of this case, the parties have agreed that Mr. Bailey's net one-half interest in the community estate (without regard to the estate tax and related expenses) as of the date of his death was $73,396.68, consisting of the following: Item
Value as of 7/17/43
Family home at 4217 Versailles, Ave.,
Dallas, Texas
$ 8,400.00
Cash
3,924.92
Stocks and bonds: Misc.
130.00
Liggett & Myers (363.25 shares)
29,541.47
Polaroid (13.83 shares)
666.88
Misc. in Mrs. Bailey's name
25,776.40
Misc. in Mr. Bailey's name
4,957.01
Total
$73,396.68
Mrs. Bailey chose to administer Mr. Bailey's estate herself as unqualified community survivor, without formal administration. *362 Joseph III did not participate in the settlement of his father's estate. There is no evidence that Mrs. Bailey set up any separate account or trust for the benefit of Joseph III representing his share of his father's estate. [2] Mrs. Bailey told Joseph III that his father left no property at his death. *363 In a letter dated September 12, 1984, written by H. F. Thompson (Thompson), one of Mrs. Bailey's attorneys, to John P. Butler (Butler) of the Mercantile Commerce & Trust Company in St. Louis, Missouri, who assisted Mr. Thompson in preparing the estate tax return for Mr. Bailey's estate, Mr. Thompson stated the following: * * * Mrs. Bailey has paid community debts, with the exception of the Dallas National Bank loan. She has made current payment of installments on this loan as they became due, but has not fully discharged the indebtedness. * * * The only loan from the Dallas National Bank listed on the estate tax return for Mr. Bailey's estate is one in the amount of $5,700 described as "indebtedness against property at 4217 Versailles Avenue, Dallas, Texas," the Bailey family residence. From the ages of 11 to 17, Joseph III attended boarding schools in various parts of the country, and was, therefore, away from home for a good part of those years. In 1943, Joseph III returned to Dallas and completed his high school education while living at home. In 1944, he entered active duty with the Marine Corps, and spent the next 2 years, except for a brief leave, in the Pacific *364 theater during World War II. In August 1946, Joseph III returned to Dallas and lived with his mother and her then husband, William McKinney (McKinney), from whom Mrs. Bailey was divorced in 1950. From 1946 to 1949, Joseph III attended Southern Methodist University, supported partially by the G. I. Bill and partially by his mother. After working as a car salesman in Dallas, he joined the Air Force in 1953 and served until the spring or summer of 1954. When he returned to Dallas in 1954, Joseph III married and moved into his own house. In 1954, he went to work for a real estate company selling houses and small apartment houses until 1958. In 1958, Joseph III started his own construction business building houses and some apartment houses. He continued building until 1971 and, after that time, he continued to manage the apartment houses which he had previously built. On May 16, 1949, when he was 23 years old. Joseph III joined Mrs. Bailey (then Mrs. McKinney) and McKinney in signing a deed for the sale of the residence at 4217 Versailles Avenue, the house in which the Bailey family had resided. He was told by a closing officer of the title company where the sale was closed that *365 his signature was required on the deed because he lived in the house. Although, under Texas law, Joseph III owned his father's one-half interest in this community property asset, Joseph III did not receive any of the proceeds of the sale. On the same day, May 16, 1949, Mrs. Bailey filed an Affidavit of Heirship which was recorded on May 23, 1949, on the deed records of Dallas County. In the affidavit, Mrs. Bailey stated that Mr. Bailey died and left no will; that administration of his estate was unnecessary; that all debts left owing by him were paid in full; and that Joseph III was Mr. Bailey's only child. Between 1951 and 1961, Mrs. Bailey made transfers of cash, stock, and other property worth $929,504.24 as evidenced by U.S. Gift Tax Returns filed by Mrs. Bailey. These transfers included 2,400 shares of Liggett & Myers stock valued at $175,675 and 1,000 shares of Polaroid stock valued at $181,250. Some of the transfers represented forgiveness of loans made by Mrs. Bailey to assist Joseph III in his various business ventures. Other than these transfers, Mrs. Bailey did not participate in Joseph III's business affairs; nor did Joseph III involve himself in Mrs. Bailey's *366 business affairs. Mrs. Bailey died in 1976, leaving her entire estate, valued at $1,595,491.03, to Joseph III with the exception of specific bequests of jewelry valued at $3,675. By the date of Mrs. Bailey's death, September 6, 1976, the only traceable assets left from Mr. Bailey's share of the community assets were shares of Polaroid and Liggett & Myers stocks. By September 6, 1976, the 13.83 shares of Polaroid stock owned in 1943 by Mr. Bailey were worth $133,883. The 363.25 shares of Liggett & Myers stock owned in 1943 by Mr. Bailey were worth $230,609. The other assets owned by Mr. Bailey in 1943, then worth $43,188, were worth $402,746 by 1976. Joseph III, as executor of his mother's estate, claimed a deduction in the amount of $765,282.50 as a claim against Mrs. Bailey's estate under section 2053(a)(3), allegedly representing the 1976 value of a constructive trust held by Mrs. Bailey for Joseph III as his share of his father's 1943 net estate. [3] Respondent denied the deduction. *367 In Estate of Bailey v. Commissioner,79 T.C. 441 (1982), we held that, on the facts, Mrs. Bailey's estate was not entitled to the claimed deducation. We concluded that a Texas court would not have imposed a constructive trust on Mrs. Bailey's estate, because, even though she did not formally account to Joseph III for his share of his father's estate, she transferred to Joseph III, between 1951 and 1961, cash and property with a value over 12 times the 1943 value of Joseph III's share of his father's estate and such transfers were sufficient to satisfy his claim against her. On appeal, the Court of Appeals for the Fifth Circuit in Estate of Bailey v. Commissioner,741 F.2d 801 (5th Cir. 1984), concluded that a Texas court would have imposed a constructive trust in this case; that Mrs. Bailey's lifetime transfers to Joseph III did not satisfy his claim because they represented gifts to him from her own separate property, not from Mr. Bailey's one-half share of the community. The Fifth Circuit remanded the case to us for purposes of determining (1) whether Joseph III's claim against Mrs. Bailey's estate for a constructive trust would be barred by *368 the Texas 4-year statute of limitations; and (2) the 1976 value of Mr. Bailey's estate. ULTIMATE FINDINGS OF FACT 1. Joseph III did not discover his interest in his father's estate until after his mother's death in 1976; and 2. As of September 6, 1976, the date of Mrs. Bailey's death, the total asset value of Mr. Bailey's 1943 estate was $767,238. OPINION 1. The Statute of Limitations
The first issue for decision is whether Joseph III's claim against his mother's estate for a constructive trust representing his share of the estate of his father, asserted in 1976, some 33 years after his father's death in 1943, would be held barred by a Texas court under the 4-year statute of limitations prescribed by Tex. Rev. Civ. Stat. Ann. art. 5529 (Vernon 1958). After careful consideration of both the facts and relevant Texas precedent, we conclude that Joseph III's claim would not be held barred. On the death of Mr. Bailey intestate, title to a one-half share of the community estate immediately vested in Joseph III, Mr. Bailey's only child, who was then 17 years old. *369 Belt v. Cetti,100 Tex. 92, 93 S.W. 1000, 1002 (1906). As the unqualified community survivor, however, Mrs. Bailey had the right to take control of the entire community estate and exercise such powers as were necessary to collect claims due the community estate, discharge community obligations, and generally wind up community affairs. Southern Underwriters v. Lewis,150 S.W.2d 162, 167-168 (Tex. Civ. App. 1941). Mrs. Bailey's power to act as unqualified survivor and to exercise control over the community estate continued so long as there were debts legally chargeable to the community estate. Davis v. Magnolia Petroleum Co.,105 S.W.2d 695, 698 (Tex. Civ. App. 1937), affd. 134 S.W.2d 1042 (Tex. Comm. App. 1940). After the community estate had been fully administered and all community debts paid, however, Mrs. Bailey was charged to hold Joseph III's share of the community assets in trust for his benefit. Grebe v. First State Bank of Bishop,150 S.W.2d 64, 67 (Tex. 1941). As indicated above in our findings, by September 12, 1944, the date of Thompson's letter to Butler, Mrs. Bailey had paid all community *370 debts with the exception of the $5,700 mortgage held by the Dallas National Bank against the Bailey family residence at 4217 Versailles Avenue. Presumably, this mortgage debt was satisfied upon the sale of the family residence on May 16, 1949. Cf. Davis v. Magnolia Petroleum Co.,105 S.W.2d at 698. The Affidavit of Heirship filed by Mrs. Bailey on the same day as the sale states that all debts left owing by Mr. Bailey were paid in full. Thus, as of May 16, 1949, with all community debts paid, Joseph III, who by that time was 23 years old, was entitled to enforce his right to receive his share of the Community estate. Miller v. Miller,34 Tex. Civ. App. 367, 78 S.W. 1085, 1986 (1904); Williford v. Simpson,217 S.W. 191, 192 (Tex. Civ. App. 1919). In its opinion, the Fifth Circuit held that Mrs. Bailey's failure to turn over to Joseph III his share of the community estate after the community debts were paid, and her retention and use of the property "for her own purposes" for 30 years amounted to "at least constructive fraud." *371 741 F.2d at 805. The Fifth Circuit rejected this Court's view that Mrs. Bailey's transfers to Joseph III of property worth over $900,000 constituted a sufficient accounting to him or demonstrated that Mrs. Bailey was not unjustly enriched at his expense.Citing Grebe v. First State Bank of Bishop,supra, the Fifth Circuit concluded that Texas courts would thus impose a constructive trust upon Mrs. Bailey representing Joseph III's share of the community estate after payment of the community debts. The 4-year statute of limitations in a case involving a constructive trust does not begin to run until the beneficiary knew or should have known he had a cause of action. Hatton v. Turner,622 S.W.2d 450, 459 (Tex. Civ. App. 1981); Andretta v. West,415 S.W.2d 638, 642 (Tex. 1967). Similarly, fraud prevents the running of the statute of limitations until the fraud is discovered, or should have been discovered, by the exercise of such diligence as would be exercised by a person of ordinary care and prudence. *372 Cartwright v. Minton,318 S.W.2d 449, 454 (Tex. Civ. App. 1958). Joseph III testified that he did not discover that he had inherited anything from his father until, after his mother's death in 1976, he found certain documents in her safe deposit box indicating his right to share in the community estate. Further, Joseph III testified that his mother told him that his father left nothing at his death. Thus, petitioner argues that the statute of limitations could not have begun to run against Joseph III's claim until after the death of his mother in 1976 when he actually discovered his father died possessed of a share in the community estate and that his father's share descended to him, his father's only child. Respondent argues, citing Ruebeck v. Hunt,176 S.W.2d 738, 739 (Tex. 1943), that if the defrauded party has knowledge of facts that would have excited inquiry in the mind of a reasonably prudent person, which if pursued by him with reasonable diligence would lead to the discovery of fraud, the knowledge of fraud must be implied. Respondent contends that when Joseph III joined his mother and stepfather in signing the deed for the sale of the *373 family residence in 1949, when he was 23 years old, his knowledge of this fact should have led him, had he exercised reasonable diligence, to discover at some time well before 1976, that he had an interest in the property sold, and importunes us to conclude that the statute of limitations must have run by 1976. Whether reasonable diligence has been exercised in the discovery of fraud is a question of fact. Corbell v. Stengel,83 S.W.2d 1084, 1087 (Tex. Civ. App. 1935). On cross-examination by respondent's counsel, Joseph III twice testified that he inquired of his mother and she told him that his father left no estate. Counsel made no effort to clarify or test the truthfulness of this testimony, and it is the only direct evidence on the point. We do not think that Joseph III's 1949 signing of the deed covering the family residence, standing alone, was sufficient to charge him with knowledge of his inheritance, given the circumstances of this case. As petitioner correctly points out, the requirement of due diligence in discovering fraud does not exact as prompt or as searching an inquiry into the conduct of the trustee where a relationship of special confidence *374 exists between trustee and beneficiary such as that of mother and son. Edsall v. Edsall,238 S.W.2d 285, 288 (Tex. Civ. App. 1951); Atkins v. Dodds,121 S.W.2d 1010, 1017 (Tex. Civ. App. 1938). At the time of the sale of the family residence, Joseph III was still living at home and being supported, at least partially, by his mother. Beginning about 2 years later in 1951, and continuing to 1961, she made the series of gifts to him which exceeded $900,000 in amount. We do not think he would have had any reason to suspect that his mother was misleading him, defrauding him, or otherwise withholding anything from him. We think Joseph III was entitled to rely on his mother's representations to him that his father left him nothing and we think the record before us requires a finding that Joseph III did not learn of his interest in his father's estate until after his mother's death. The statute of limitations, therefore, did not begin to run until such discovery in 1976 and, thus, we conclude that Joseph III's claim would not be held barred. [4]
*375 2. Valuation Issue
Having decided above that a Texas court would not hold that Joseph III's claim for a constructive trust was barred by the statute of limitations, we next must decide the value of the constructive trust as of the date of Mrs. Bailey's death, September 6, 1976. The parties have agreed that for purposes of this case, Mr. Bailey's net interest in the community estate, consisting of the family home, cash, miscellaneous property, and various stocks and bonds (including shares in Polaroid and Liggett & Myers), at the time of his death in 1943 was $73,396.68. The parties have used this figure to project the 1976 value of Mr. Bailey's interest in the community estate which should have been turned over by Mrs. Bailey to Joseph III. Both parties presented expert testimony at trial, discussed below, to describe the respective valuation approaches taken to reach their disparate conclusions with respect to the 1976 value of the 1943 net estate, i.e., $767,238 as petitioner contends and $212,809.39 as respondent contends. After careful consideration of the approaches taken and the respective values reached by both petitioner and respondent, we conclude that petitioner's *376 valuation of $767,238 most accurately reflects the 1976 value of Mr. Bailey's 1943 net estate. We adopt petitioner's valuation as a finding of fact. Henry C. Griego (Griego) testified as respondent's expert witness. Griego had then been employed by the Internal Revenue Service (IRS) for 22 months as an estate and gift tax attorney, in that capacity he audits estate and gift tax returns. In order to determine the 1976 value of the constructive trust, Griego determined a present value factor based on averages of the prime rate of interest, [5] "as existed over the life of the trust," and applied the factor, 4.446617, to the sum $47,858.72, which represents the 1943 value of Mr. Bailey's estate not including the Polaroid and Liggett & Myers stocks, which were the subject of lifetime gifts by Mrs. Bailey to Joseph III. Griego arrived at an estimated value in 1976 of $212,809.39. *377 Griego testified that he chose the prime rate of interest-- because I considered that the yields using the prime rate would be most indicative of the value of the trust, constructive trust, given the fact that it was a constructive trust and that the assets in the trust were to be conserved, and the prime rate geared to the most secure type of securities would yield the most secure type of benefits for the trust. On brief, respondent contends that the Polaroid and Liggett & Myers stocks should not be included in the constructive trust (and thus were not included in Griego's report) because, during her lifetime, Mrs. Bailey transferred to Joseph III 2,400 shares of Liggett & Myers stock valued, as of 1952 and 1961 when the transfers were made, at $175,675, and 1,000 shares of Polaroid stock valued, in 1961, at $181,250. Respondent contends that because of these lifetime transfers by Mrs. Bailey, Joseph III's claim as to these two traceable stocks was extinguished. Petitioner's expert witness was Charles Faerber (Faerber), who is employed as an actually by an actuarial consulting firm. His work involves valuation of pension plans, producing employee benefit statements, and doing *378 benefit increase studies. He has also done some expert witness work in litigation involving interest rates. Faerber testified that, in valuing the estate, the compared the assets contained in Mr. Bailey's estate in 1943 with those contained in Mrs. Bailey's estate in 1976 and that what would constitute Mr. Bailey's share of the community estate could be divided into two classes of assets: (1) traceable stocks, the shares of Polaroid and Liggett & Myers, and (2) nontraceable assets. His approach to valuation was to attempt to ascertain what actually happened to the value of Mr. Bailey's assets after having been handled by Mrs. Bailey for 33 years. For the traceable stocks, Faerber prepared, for both the Polaroid and Liggett & Myers shares, a detailed, year-by-year history of stock splits, stock dividends, and dividends paid from 1943 and 1976. He determined that one share of Polaroid stock owned in 1943 would have grown to 216 shares by 1976; that accumulated dividends for one share of Polaroid stock owned in 1943 and reinvested at a 7-percent yield would equal $1,148.59; that, given a price per share of $39.50 on September 6, 1976, Mrs. Bailey's date of death, one share of Polaroid *379 stock owned in 1943 would be worth $9,680.59. Thus, Mr. Bailey's 13.83 shares of Polaroid stock in 1943 would be worth $133,882.56 in 1976. Similarly, Faerber determined that one share of Liggett & Myers stock owned in 1943 would have grown to two shares by 1976; that accumulated dividends for one share of Liggett & Myers stock owned in 1943 and reinvested at a 7-percent yield would equal $568.35; and that, given a price per share of $33.25 on September 6, 1976, one share of Liggett & Myers stock owned in 1943 would be worth $634.85. Thus, Mr. Bailey's 363.25 shares of Liggett & Myers stock in 1943 would be worth $230,609.26 in 1976. With respect to the nontraceable assets, Faerber applied to their 1943 value, $43,188.33, a present value factor of 9.325340. He determined this percentage based on an assumed 7-percent yield for the 33-year period from 1943 to 1976, and he arrived at a value of $402,746. Faerber determined a 7-percent yield by taking a weighted average of the respective long-term yields over the 33-year period from the bond market, 3 percent, and the stock market, 11.6 percent, assuming that investments would be made in 50-percent stocks and 50-percent fixed income *380 assets. Faerber based this assumption on the fact that in 1943, Mrs. Bailey's assets consisted of 65 percent stock/35 percent other assets, and in 1976, her portfolio was made up of 56 percent stock/44 percent fixed income assets. In sum, it was Faerber's best estimate that the 1976 value of Mr. Bailey's estate was $767,238. In our view, Faerber's estimate reasonably reflects the historical growth of the assets as they were held in the hands of Mrs. Bailey. We find respondent's estimate deficient in two major respects. First, because the Fifth Circuit concluded that Mrs. Bailey's lifetime gifts to Joseph III were from her personal property, we reject respondent's argument that the value of the Polaroid and Liggett & Myers stocks should be excluded from the constructive trust.In its opinion, the Fifth Circuit stated (741 F.2d at 804, 805): This [Mrs. Bailey's filing of gift tax returns], we think, is indisputable evidence that she considered the gift funds to be her own property * * *. * * * * * * [W]e find that the gift tax returns filed by Mrs. Bailey preclude us from finding that the intervivos gifts from mother to son extinguished her duty *381 to transfer to him the whole of his father's portion of the community estate when he became entitled to it. * * * We think this conclusion requires the inclusion of the value of the traceable stock in the constructive trust. Respondent's estimate, which does not take into account these two major trust assets, is thus incomplete and, consequently, too low. Second, we do not think that the present value factor applied by respondent to the value of the nontraceable trust assets, based as it is on an assumed percentage yield tied to an average of the prime rate of interest during the period 1943-1976, is reflective of the actual asset growth. As defined by Griego, the prime rate of interest is that rate charged by banks to their preferred customers on short-term loans. We accept the testimony of Faerber, petitioner's expert, that the prime rate, based only on the short-term loan rate, does not, indeed, could not, accurately reflect the significantly higher yields of stock market investments held over the long term, such as those held by Mrs. Bailey. Respondent's argument that, as constructive trustee, Mrs. Bailey was charged to conserve the assets through conservative investments *382 which necessarily have lower yields ignores the fact, as stressed by the court of appeals, that Mrs. Bailey treated Joseph III's assets as her own for 33 years and ignored her obligations as trustee. We must, of course, bow to the court of appeals' conclusions. Thus, to tie the rate of return to investments which Mrs. Bailey should have made and she been conserving Joseph III's property is to turn a blind eye to what she actually did with the assets. We agree with petitioner that Faerber's estimate much more accurately reflects the actual historical growth of the assets over the 33-year period. While respondent's estimate excludes the traceable stock, Faerber's detailed year-by-year analysis of the Polaroid and Liggett & Myers stocks is, in our opinion, reasonable. While respondent's expert assumed a low percentage yield on the nontraceable assets based only on the short-term prime rate of interest, Faerber looked at the actual composition of Mrs. Bailey's portfolio, both as of 1943 and 1976, and assumed a percentage yield based on a weighted average that took into account the fact that her investments consisted not only of fixed investments, which would yield an average of 3 *383 percent (similar to respondent's conclusion), but also of stocks which had a much higher average yield of 11.6 percent during the 33-year period at issue. In conclusion, we think Faerber's estimate of $767,238 closely tracks the increase in the value of the assets in Mr. Bailey's estate as handled by Mrs. Bailey. This is the amount which is properly allowable as a claim against the estate under section 2053(a)(3). To reflect the disposition of issues not litigated, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Upon Mr. Bailey's death intestate, Mrs. Bailey had three statutory choices for handling Joseph III's share of the community property. First, she could have had the estate formally administered (Tex. Rev. Civ. Stat. art. 3290, et seq. (1925) (repealed effective Jan. 1, 1956)); second, she could have formally qualified as community survivor (Tex. Rev. Civ. Stat. art. 3661, et seq. (1925) (repealed effective Jan. 1, 1956)); or, third, she could have sought appointment as guardian of the estate of Joseph III, her minor child (Tex. Rev. Civ. Stat. art. 4102, et seq. (1925) (repealed effective Jan. 1, 1956)). In addition, Mrs. Railey had the recognized right, as an "unqualified "community survivor, to take control of the community property with full authority to manage and dispose of it for the purpose of paying community debts. Grebe v. First State Bank of Bishop,136 Tex. 226, 150 S.W.2d 64, 66-67↩ (1941).
3. The Probate Court of Dallas County formally allowed the claim, but did not pass on the facts upon which deductibility of the claim depends because there was no adverse party objecting to the constructive trust deduction.↩
4. We also reject respondent's contention that the filing by Mrs. Bailey of an Affidavit of Heirship, recorded on the deed records of Dallas County, should have served as notice to Joseph III of his interest in his father's estate. There is no evidence that Joseph III had any knowledge of its filing by Mrs. Bailey. Further, the affidavit itself makes no reference to any property owned by Mr. Bailey at his death. Such affidavits are regularly used in Texas to provide proof of heirship in intestacy situations where there is no administration, as an inexpensive alternative to a formal declaration of heirship proceeding which must be conducted in a probate court. An affidavit of heirship fills the gap in the chain of title between the deceased grantee and the subsequent grantor heirs. See J. Howard Hayden, "Affidavits of Heirship", 31 Texas Bar Journal 741, 742 (1968). We think that an affidavit of heirship recorded on the deed records, like the deed itself, "is notice only to those who claim through or under the grantor by whom the deed was executed." White v. McGregor,50 S.W. 564, 565 (Tex. 1899). See also Lynch v. Lynch,130 S.W. 461, 463 (Tex. Civ. App. 1910), which quotes the following: "No one is required to watch the clerk's office to see that those in possession of property in privity with him or in subordination to his title are not acquiring rights adverse to him." Hulvey v. Hulvey,92 Va. 182, 23 S.E. 235. Because deed recordation, and presumably the recordation of affidavits of heirship as well, serves only as notice to subsequent purchasers of property, we decline to charge Joseph III with knowledge of his father's estate on this basis.↩
5. Griego defined the prime rate of interest as the interest rate "that banks charge the most favored customers over short term loans." The following indicates the periods used and the average prime rate over the periods as determined by Griego: ↩
Period
of Time
Years
No. of Years
Average Percentage Rage
1.
1943
1/2
1.5
2.
1944 - 1950
7
1.75
3.
1951 - 1956
6
3.25
4.
1957 - 1965
9
4.5
5.
1966 - 1968
3
6.0
6.
1969 - 1970
2
8.0
7.
1971 - 1972
2
5.5
8.
1973
1
8.0
9.
1974
1
10.75
10.
1975
1
7.75
11.
1976
3/4
6.75